In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-2334

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

*v.*

MARIO A. RODRIGUEZ-ESCALERA,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 16-CR-30114-SMY — **Staci M. Yandle**, *Judge.*

ARGUED JANUARY 10, 2018 — DECIDED MARCH 7, 2018

Before WOOD, *Chief Judge*, HAMILTON, *Circuit Judge*, and
BUCKLO, *District Judge*.[*]

BUCKLO, *District Judge*. Defendant-appellee Mario Rodri-
guez-Escalera ("Rodriguez") and his fiancée Blanca Moran
were arrested and charged with possession with intent to
distribute methamphetamine in violation of 21 U.S.C. § 841,

---

[*] Of the Northern District of Illinois, sitting by designation.

after police discovered a large amount of methamphetamine and cash in Moran's vehicle during a traffic stop. Before the district court, Rodriguez and Moran each moved on Fourth Amendment grounds to suppress the evidence obtained in the vehicle search. Concluding that the evidence was derived from an unlawfully extended traffic stop, the court granted both motions. On appeal, the government challenges the grant of Rodriguez's motion to suppress. We affirm.

## I.

On October 4, 2016, Illinois State Trooper Kenneth Patterson observed a car abruptly switch lanes in front of a truck without using a turn signal on Interstate 70 in southern Illinois. Patterson decided to pull the car over for the traffic infraction. *See* 625 ILCS §§ 5/11-703(a), 5/11-804. Equipped with a dashboard video camera, Patterson's vehicle recorded the ensuing traffic stop.

Once the car stopped, Patterson approached the passenger side of the vehicle to find Rodriguez in the front passenger seat and Moran in the driver's seat. Patterson greeted them and asked Moran to provide her license, registration, and proof of insurance. Moran promptly complied. Her license indicated that she was from Paramount, California, a city in Los Angeles County. After gathering Moran's documentation, Patterson told Moran why he stopped her and explained that he intended to issue her a written warning for her traffic violation. He asked her to accompany him in his squad car while he ran her information and issued the warning. Moran agreed.

Patterson led Moran to the front passenger seat of his squad car then returned to Moran's vehicle to ask Rodriguez

for his identification. As Rodriguez retrieved his documentation, Patterson inquired where he and Moran were headed. Rodriguez answered Pennsylvania. Then he handed Patterson his Mexican identification card and his Mexican driver's license. Patterson kept the identification card and handed back the driver's license before returning to his squad car.

Back in his vehicle, Patterson reviewed Moran's and Rodriguez's documents and began to question Moran about her travel plans. Moran told Patterson that she and Rodriguez, her fiancé, had come from Los Angeles and were heading to New York City to visit the city for the first time while she was on vacation from her job as a tax preparer and insurance broker. Patterson asked where she and Rodriguez were planning to go in New York. Moran replied that she wanted to see Manhattan, Brooklyn, and the Statue of Liberty. When Patterson asked how long the trip would last, Moran told him that she had two weeks off from work. She and Rodriguez did not have lodging booked in New York yet, she told Patterson, but they would look for a hotel when they arrived in the city.

About eight minutes into the traffic stop, Patterson discovered that Moran's California driver's license was suspended. He informed Moran, who was apparently surprised by the news, and asked whether Rodriguez had a license so that he could drive instead. Moran said that he had a Mexican license, so Patterson returned to Moran's vehicle to collect it from him. Moran remained in the squad car. While Rodriguez retrieved his license, Patterson probed for more information about the couple's apparently conflicting travel plans. He asked Rodriguez what city in Pennsylvania he and Moran were going to visit. Rodriguez, who evidently had

limited English skills, indicated that he did not know. Patterson then asked how long they were going to be gone; Rodriguez said one or two days. Finally, Patterson asked if they were visiting friends or family there. Rodriguez said no.

After this brief exchange with Rodriguez, Patterson returned to his squad car. About eleven minutes had passed since he initiated the traffic stop, and Patterson now had all of the information he needed from Moran and Rodriguez to issue the traffic citations and send them on their way. But Patterson had grown suspicious of the couple's travel plans and decided to have a narcotics-detection dog sniff Moran's vehicle. Patterson could see from his in-vehicle computer, however, that his department's K-9 unit was occupied with another traffic stop.

Patterson took nearly twenty-two minutes to issue Moran three routine traffic citations—one ticket for driving with a suspended license, one written warning for failing to signal when changing lanes, and one written warning for improper overtaking. Before he started writing the citations, Patterson asked Moran for more details about the couple's travel itinerary. He inquired whether she and Rodriguez planned to stop anywhere else on their way to New York. Moran said that they did not. Troubled by the apparent conflict, Patterson then asked if Rodriguez knew that they were going to New York. Moran smiled and explained that she told Rodriguez that they were going to Pennsylvania. When Patterson asked why, Moran said she wanted the visit to New York City to be a surprise. Upon further questioning, she explained that Rodriguez knew that they would be gone for two weeks. She also told Patterson that Rodriguez was

not currently employed but that he would be looking for work in construction once they returned to Los Angeles.

Over the next several minutes, Patterson worked at his in-vehicle computer, occasionally chatting more with Moran, as he listened to his police radio waiting for the K-9 unit to become available. Patterson eventually heard on the radio that the traffic stop holding up the K-9 unit had ended in an arrest. Patterson messaged State Trooper John Baudino, the K-9 unit officer, to see if he was available. Not until Baudino confirmed that he was available and on his way did Patterson begin writing Moran's ticket for driving with a suspended license.

Baudino raced to Patterson's location, arriving about ten or eleven minutes after Patterson's request and nearly thirty-three minutes into the traffic stop. As soon as he saw that Baudino's vehicle was behind him, Patterson handed Moran her traffic ticket and written warnings, along with her license, registration, and proof of insurance. He then instructed Moran to stay in the squad car while the K-9 unit sniffed her vehicle. Patterson walked to Moran's car and told Rodriguez to roll up his window.

Baudino walked his narcotics-detection dog around Moran's car twice. The dog did not alert him to the presence of any contraband. Despite the negative dog sniff, Patterson remained unconvinced. He returned to his squad car, where Moran was still detained, and resumed questioning her. He asked her whether there was anything illegal in her vehicle. She said there was not. He explained that he just wanted to make sure that she and Rodriguez were actually going to New York. He inquired about Moran's luggage and whether anyone had given her any luggage to take along to New

York. She said she only had her luggage. Patterson's questioning concluded with the following exchange:

> Patterson: Okay. You're free to go and everything but I'm just concerned that there might be something illegal inside the car. Usually, most people don't say, "Hey, let's go on a trip." And then, they … it's a surprise, they go to New York. It's kind of out of the ordinary I should say. I know that probably doesn't make any sense to you.
>
> Moran: No.
>
> Patterson: Does that not make any sense to you? A strange trip?
>
> Moran: No. I take my vacations.
>
> Patterson: Yeah, but telling someone you are actually going to Pennsylvania and then actually you are going to New York, that's kind of out of the ordinary as far as a trip goes, itinerary wise. Can I search that vehicle and its contents …
>
> Moran: Sure.
>
> Patterson: … to make sure there is nothing illegal, is that all right?
>
> Moran: (nods yes)
>
> Patterson: I'll just have you stay in the vehicle and I'll have [Rodriguez] step out.

Patterson and Baudino then conducted a search of Moran's vehicle. In her trunk, they uncovered approximately

7.5 pounds of methamphetamine hidden in two pieces of luggage. In Moran's purse, they discovered nearly $28,000 in cash. Rodriguez claimed ownership of the drugs, Moran claimed ownership of the money. The officers placed them both under arrest.

Moran and Rodriguez were each charged with one count of possession of methamphetamine with intent to distribute. *See* 21 U.S.C. § 841(a)(1). Both filed pretrial motions to suppress the drug evidence seized from Moran's vehicle, claiming that Patterson unlawfully detained them beyond the time necessary to complete the traffic stop and that Moran had not freely given her consent to the search.

The district court held a two-day evidentiary hearing on Moran's motion to suppress, and, by agreement of the parties, adopted its evidentiary findings in Rodriguez's case in lieu of an additional evidentiary hearing. At Moran's suppression hearing, Patterson testified about several factors that triggered his suspicion during the traffic stop. He told the district court that when he first approached Moran's front passenger window after making the stop, he smelled a "very pungent" scent of air fresheners and noticed "several" air vent clip-in air fresheners inside Moran's vehicle, which he had been trained to associate with narcotics traffickers. Patterson told the court that the couple's origin city further contributed to his suspicion. Los Angeles, he explained, is known as a major distribution center for narcotics trafficking. Patterson testified that he also found it odd that Rodriguez did not initially look up at him and instead seemed to be distracted by a video game on his phone when Patterson introduced himself. Similarly, he thought Moran seemed nervous when he asked her questions in his squad car. Final-

ly, Patterson told the court that Moran's and Rodriguez's conflicting travel plans spurred his suspicions. He explained that the discrepancies in their responses made him think that they were not making "just an ordinary trip." He suspected that there was "some kind of ulterior motive [for] why they [we]re traveling … some kind of criminal element going on."

The district court was unconvinced. Weighing Patterson's testimony and the video and audio recording of the traffic stop, the district court concluded, first in an oral ruling on Moran's motion, then in two subsequent written orders on Moran's and Rodriguez's motions, that Patterson did not have the reasonable suspicion necessary to extend the stop. Contrary to Patterson's description of Moran's nervous demeanor, the court found that Moran was "relatively calm and collected throughout the stop," even as she was made to sit in Patterson's vehicle and answer questions for approximately thirty minutes. Likewise, the court found that Rodriguez, despite his initial inattentiveness, responded when Patterson spoke directly to him. The court acknowledged that conflicting travel plans could support reasonable suspicion, but determined that the additional information that Moran gave Patterson "objectively diminishe[d] the possible conflict." The court also concluded that the air fresheners that Patterson observed in Moran's vehicle were not so excessive as to raise a reasonable suspicion. In the court's view, the government's "proffered factors, individually and in combination, [we]re insufficient to support [its] claim that Trooper Patterson had a reasonable suspicion of criminal activity to justify a prolonged traffic stop." The court declined to credit Patterson's explanations for his delay, and instead determined that he "intentionally prolonged the stop" to give the K-9 unit time to arrive. Because it con-

cluded that Patterson unreasonably extended the traffic stop, the court granted Rodriguez's motion to suppress the evidence obtained from Moran's vehicle as fruit of an unlawful seizure. The government appeals from this decision, arguing that neither the traffic stop nor the vehicle search violated Rodriguez's Fourth Amendment rights.

## II.

We employ "a mixed standard of review on motions to suppress, reviewing the district court's factual determinations for clear error and *de novo* its ultimate determination about whether the police had sufficient grounds to stop or search the individual." *United States v. Wilbourn*, 799 F.3d 900, 908 (7th Cir. 2015) (citing *Ornelas v. United States*, 517 U.S. 690, 699 (1996)).

The Fourth Amendment guarantees the right to be free from "unreasonable searches and seizures" by the government. This protection "extend[s] to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Thus, whenever a police officer decides to stop a vehicle, the stop must meet the reasonableness requirements of the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 663 (1979). If a search or seizure violates the Fourth Amendment, courts will exclude evidence gained from that violation in judicial proceedings against the person injured. *Wilbourn*, 799 F.3d at 910; *see also Terry v. Ohio*, 392 U.S. 1, 29 (1968) ("[E]vidence may not be introduced if it was discovered by means of a seizure and search which were not reasonably related in scope to the justification for their initiation.").

The Fourth Amendment's protections are "personal rights" that "may not be vicariously asserted." *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978). To challenge evidence obtained in an unlawful search, a person must show that he had a "legitimate expectation of privacy" in the area searched. *Id.* at 143, 149. Typically, a passenger *qua* passenger lacks a legitimate expectation of privacy in a searched vehicle, unless he can show that he has some possessory interest in it. *See id.* at 148–49; *Wilbourn*, 799 F.3d at 908.

A passenger without standing to challenge a vehicle search may nevertheless challenge the legality of a traffic stop. In *Brendlin v. California*, 551 U.S. 249 (2007), the Supreme Court held that because a traffic stop seizes all vehicle occupants, a vehicle passenger has standing to suppress evidence derived from an unlawful traffic stop. *Id.* at 255–59; *Wilbourn*, 799 F.3d at 908 (a passenger has standing to challenge evidence derived from an illegal stop but not evidence derived from an illegal search after a lawful stop). That includes evidence obtained in a search resulting from an unlawful stop. *See United States v. Sanford*, 806 F.3d 954, 959 (7th Cir. 2015). Here, the district court concluded that Rodriguez did not have standing to challenge the search itself because he lacked any property or possessory interests in the vehicle. Rodriguez's standing to challenge the drug evidence uncovered in Moran's vehicle thus depends on whether the traffic stop was unlawful.

To pull a car over for a brief investigatory stop, a police officer must have "at least [an] articulable and reasonable suspicion" that the particular person stopped is breaking the law. *Prouse*, 440 U.S. at 663. Here, there is no dispute that, after observing Moran abruptly change lanes without signal-

ing, Patterson had a lawful basis for initiating the stop. *See* 625 ILCS §§ 5/11–703(a), 5/11–804; *United States v. Muriel*, 418 F.3d 720, 724 (7th Cir. 2005) (officer-observed traffic violation triggers probable cause to stop). But a seizure that is "lawful at its inception" can nonetheless violate the Fourth Amendment if it is "prolonged beyond the time reasonably required to complete" the initial mission of the stop. *Illinois v. Caballes*, 543 U.S. 405, 407 (2005) (citing *United States v. Jacobsen*, 466 U.S. 109, 124 (1984)). That is what the district court concluded happened here.

The Supreme Court considered the reasonable duration of traffic stops in *Rodriguez v. United States*, 135 S. Ct. 1609 (2015). In that case, a police officer lawfully pulled a vehicle over for a traffic violation, issued a written warning for that violation, then continued to detain the vehicle and its driver while he conducted a dog sniff. *Id.* at 1613. The Court held that the officer's prolonged detention of the vehicle, even if it was slight, was unlawful, unless it was supported by a reasonable suspicion of criminal activity independently sufficient to justify a seizure, an issue the Court left to the lower courts to evaluate on remand. *Id.* at 1615–17. The authority to detain a vehicle and its occupants for a police-observed traffic violation, the Court reasoned, ends when the "tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* at 1614. Absent reasonable suspicion, then, law enforcement may not extend a traffic stop with measures like a dog sniff unrelated to the mission of the stop.

The government does not dispute that Patterson extended the traffic stop beyond the time necessary to issue the traffic citations but argues that Patterson had reasonable

suspicion to extend the stop. To meet the reasonable-suspicion requirement, an officer must have "a particularized and objective basis" for suspecting the persons detained of breaking the law. *Heien v. North Carolina*, 135 S. Ct. 530, 536 (2014). Although reasonable suspicion "embodies something less than probable cause," it requires more than a hunch or inchoate suspicion. *Wilbourn*, 799 F.3d at 909. Thus, to justify a "particular intrusion [a] police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion." *Terry*, 392 U.S. at 21.

When evaluating reasonable suspicion, courts must consider "the totality of the circumstances—the whole picture." *United States v. Cortez*, 449 U.S. 411, 417 (1981). A "divide-and-conquer analysis" that examines each factor supporting reasonable suspicion in isolation is not permitted. *District of Columbia v. Wesby*, 138 S. Ct. 577, 588 (2018). Importantly, however, the totality-of-the-circumstances test does not bar courts from discussing factors separately. *See, e.g.*, *Wesby*, 138 S. Ct. at 586–88 (discussing each factor supporting probable cause separately before considering the combined effect of those factors). It simply requires that courts consider the reasonable inferences that a law enforcement officer could draw from the objective facts in combination.

The government contends that the district court misapplied the totality-of-the-circumstances test. It argues that the court overlooked some of the factors supporting Patterson's suspicion and improperly evaluated and rejected each of the other factors in isolation. In the government's view, the factors it identified in the district court—(1) that Moran and Rodriguez appeared nervous; (2) that the couple was travel-

ing from a "major narcotics distribution center," *i.e.*, Moran's home of greater Los Angeles; (3) that the two presented conflicting travel plans; and (4) the presence of multiple air fresheners in the car—viewed together through the lens of Patterson's personal training and experience, justified Patterson's decision to prolong the detention to conduct a dog sniff. We agree with the district court, however, that taken together, these factors did not establish reasonable suspicion.

First, while courts must consider the factors supporting an officer's suspicion cumulatively, they need not accept all of an officer's proffered justifications at face value. Reasonable suspicion must be supported by objective and articulable facts, and the district court as fact-finder is entitled to weigh the evidence presented at a suppression hearing. "[B]ecause the resolution of a motion to suppress is necessarily fact-specific, we give special deference to the district court that heard the testimony and observed the witnesses at the suppression hearing." *United States v. Johnson*, 383 F.3d 538, 542 (7th Cir. 2004) (quoting *United States v. Sholola*, 124 F.3d 803, 811 (7th Cir. 1997)) (internal quotation marks omitted); *see also Ornelas*, 517 U.S. at 699 ("[A] reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers.").

In this case, the district court reviewed the evidence and found that Moran and Rodriguez did not act suspiciously nervous. We see no clear error in the court's conclusion. The video of the traffic stop—the most reliable evidence of the detainees' demeanor—shows a relatively calm Moran answering all of Patterson's questions while detained in Patter-

son's vehicle for nearly thirty minutes. And the audio foot-age of Rodriguez's pre-search interactions with Patterson reveals that Rodriguez answered all questions directly posed to him and complied with all of Patterson's requests, even if he initially did not make eye contact. *Cf. United States v. Brown*, 188 F.3d 860, 863 (7th Cir. 1999) (weighing a driver's "very nervous" appearance and his failure to make eye con-tact during a traffic stop for speeding, along with the smell of marijuana and FBI surveillance of the car's involvement in drug sales, as factors supporting reasonable suspicion). While nervousness is certainly a factor that can support rea-sonable suspicion, *see Illinois v. Wardlow*, 528 U.S. 119, 124 (2000), the court was not required to credit Patterson's testi-mony that the couple appeared nervous when the court's own review of the traffic stop footage led it to the opposite conclusion.

The district court also gave little weight to several other factors on which Patterson relied. For instance, Patterson told the court that he found it "very significant" that Moran and Rodriguez initially gave different answers when Patter-son asked them where they were going. But as the district court noted, the information Moran subsequently provid-ed—that the trip to New York was a surprise, and that she had told Rodriguez they were going to Pennsylvania—corroborated Rodriguez's answer, objectively diminishing the possible conflict. While an officer does not need to rule out innocent explanations for conduct that appears suspi-cious at first blush, *see Arvizu*, 534 U.S. at 277, a court may consider how facts later obtained mitigate or dispel suspi-cion. *See Terry*, 392 U.S. at 28 (considering whether any of the defendant's conduct "gave [the arresting officer] sufficient reason to negate [his] hypothesis" that criminal activity was

afoot). Moreover, a couple taking a spontaneous road trip to New York City is hardly implausible or surprising. The fact that one of the travelers was unaware of the ultimate destination may be unusual, but given Moran's explanation, we do not think the district erred by giving little weight to this detail.

The presence of clip-in air fresheners in the vehicle does not change our analysis.[1] The district court recognized that because air fresheners are sometimes used to mask the scent of narcotics, an excessive air freshener presence in a vehicle can, in combination with other indicators of drug trafficking or concealment, justify extending a stop. *See, e.g., United States v. Fuse*, 391 F.3d 924, 929 (8th Cir. 2004) (presence of air freshener, a prior arrest record, the absence of the car's owner, and the driver's unusual explanations for visiting Kansas City, among other reasons, justified an extended stop). A non-excessive presence of air fresheners, however, may show nothing more than a car owner's preference for the smell of air fresheners or desire to cover up other, lawful odors. *See United States v. Guerrero*, 374 F.3d 584, 590 (8th Cir. 2004). So while we agree with the government that the pres-

---

[1] The parties agree here that the district court made an error in its written order when it stated that Patterson only testified to observing two air fresheners in the front cab of the vehicle and not an air freshener in the back. Patterson testified to noticing all three during the stop. Nonetheless, in its earlier oral findings, the court considered both the front seat and back seat air fresheners, and determined that the number of air fresheners—the district court said four, but we only see evidence of three—was not "excessive or unusual … to trigger suspicion, even along with the odor." The discrepancy about how many air fresheners Patterson observed in the car is slight enough that it does not change the analysis.

ence of air fresheners should be considered as part of the whole picture, we conclude that the district court did just that and determined that the three or four small sticks clipped into the car's air vents were not "excessive" to the point of suggesting unlawful activity. That finding is not clearly erroneous.

The government next asserts that the district court overlooked the significance of the fact that Moran and Rodriguez were coming from Los Angeles. But the district court's written order acknowledged that Patterson considered Los Angeles's reputation as a "known drug distribution point," and the court explicitly considered the factor in its oral findings at Moran's suppression hearing. We do not think the court erred in discounting the probative value of the fact that the couple began their trip in greater Los Angeles, Moran's home and the country's second most populous city. *See Reid v. Georgia*, 448 U.S. 438, 441 (1980) (concluding that circumstances that "describe[d] a very large category of presumably innocent travelers" did not support reasonable suspicion).

The government also contends that the district court did not properly consider Patterson's experience as a police officer in its analysis. The totality-of-the-circumstances test "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Arvizu*, 534 U.S. at 273–74 (internal quotation marks omitted). In other words, a court may give more weight to a police officer's assessment of certain circumstances due to his particular experience with such matters. *See, e.g., United States v. Riley*, 493 F.3d 803, 809 (7th

Cir. 2007) (crediting an officer's specific observations of a suspected bank robbery which were drawn from his experience investigating bank robberies). The government argues that the district court failed to consider how Patterson's experience with highway drug interdiction informed his view of the factors supporting his suspicion. But, again, the district court did recognize that Patterson's suspicions were "based on his training and experience." Moreover, because it considered how the other factors Patterson observed—conflicting travel plans, air fresheners, and perceived nervousness—can, with other facts, support reasonable suspicion, the district court did account for the importance that such details can hold for law enforcement. That the court ultimately determined that the objective facts fell short of reasonable suspicion in this case does not mean that it overlooked how Patterson's experience and training may have caused him to evaluate air fresheners or undeveloped travel plans differently than others.

In summary, at the time Patterson requested the dog sniff, he knew that the couple was coming from the Los Angeles area, where at least Moran resided; that Moran had a few air fresheners in her car; that the couple did not have concrete travel arrangements, but that Moran was using her two-week vacation to surprise Rodriguez with a trip to New York; and that Rodriguez did not initially look up at Patterson when the officer approached the vehicle. At least two of these characteristics—the presence of a few air fresheners and originating from Los Angeles—could describe "a very large category of presumably innocent travelers." *Reid*, 448 U.S. at 441. And the other two factors—the initially conflicting travel plans and Rodriguez's initial inattentiveness to Patterson's presence—became considerably less probative

by the time Patterson called Baudino to the scene due to Rodriguez's subsequent responses to Patterson's direct questioning and Moran's explanations of the couple's travel plans. *See Terry*, 392 U.S. at 28. No criminal history, tips, or surveillance supported Patterson's suspicions. *Cf. Sanford*, 806 F.3d at 956 (history of drug arrests and gang affiliations supported officer's reasonable suspicion); *United States v. Finke*, 85 F.3d 1275, 1282 (7th Cir. 1996) (criminal history check revealed two prior drug convictions, which "strongly confirmed [the police officer's] initial suspicions"); *Brown*, 188 F.3d at 863 (FBI surveillance of vehicle's involvement in drug sales supported reasonable suspicion). Considering these factors together, as the district court did, we agree that the objective facts that Patterson observed fell short of giving him a reasonable basis for believing that criminal activity was afoot. It was therefore unreasonable to detain the couple beyond the time needed to complete the traffic stop's mission just because the only on-duty K-9 unit was tied up with another stop. Rodriguez's right to be free from unreasonable seizures does not yield to law enforcement's resource allocation strains.

One last wrinkle remains. The government argues that Rodriguez lacks standing under *Brendlin* even if the prolonged detention was unlawful because the drug evidence was derived from Moran's consent to search rather than Rodriguez's detention. We do not share this view. Moran's consent to search—which the district court deemed involuntary and which the government does not challenge on appeal—happened in the course of the prolonged detention. The government asserts that the detention had ceased because Patterson told Moran she was "free to go and everything." But in the same breath he continued to interrogate

her. Neither Moran nor Rodriguez, who was not a party to this post-sniff conversation, could have reasonably believed that the police encounter had terminated at this point. The drug evidence was therefore derived from the unlawful seizure, and Rodriguez, as a subject of that seizure, is entitled to have suppressed any evidence which is the fruit of that violation.

### III.

This is without a doubt a close case. But the record reflects that the district court closely considered the evidence, weighed the credibility of the arresting officer's testimony, and considered the weight each factor merited to conclude that the totality of the circumstances failed to support the officer's reasonable suspicion to extend the stop beyond its traffic-related mission. Because we find no clear error in the district court's factual findings and otherwise agree with its analysis, the decision below is AFFIRMED.