In the

# United States Court of Appeals

## For the Seventh Circuit

―――――――――――

No. 21-2745

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JOHN YANG,

*Defendant-Appellant.*

―――――――――――

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 1:20-cr-00234 — **William C. Griesbach**, *Judge*.

―――――――――――

ARGUED MAY 16, 2022 — DECIDED JULY 12, 2022

―――――――――――

Before EASTERBROOK, BRENNAN, and ST. EVE, *Circuit Judges*.

BRENNAN, *Circuit Judge*. John Yang challenges the district court's denial of his motion to suppress evidence obtained in a warrantless search of a vehicle in which he was a passenger. He argues that officers lacked reasonable suspicion for the stop and unlawfully extended the seizure. Because officers had reasonable suspicion to believe that a traffic violation occurred and that the vehicle's occupants were involved in illicit

drug activity, and because the officers did not unlawfully pro-
long the stop, we affirm.

**I**

On November 23, 2020, Officer Garth Russell was on pa-
trol in the "Bravo" district of Green Bay, Wisconsin. Five days
prior, Russell had received an email from another officer dis-
cussing suspected drug activity at 826 Kellogg Street, a house
in that district. The email included at least one report of re-
peated "in and out traffic at suspicious times." Russell was
also aware of drug activity at several other homes in the area.
In addition to making narcotic-related arrests, he had discov-
ered drug paraphernalia at the nearby Express Convenience
Center gas station on Dousman Street ("Dousman Express").

Sometime after 1:00 a.m., Russell observed John Yang
standing near a Dodge Ram truck at the Dousman Express.
Yang was with two other men, one of whom was holding a
chainsaw. As Russell drove past, he made eye contact with
Yang, who "kept staring at [Russell's] vehicle, … looking to
make sure [his] vehicle disappeared." After driving out of
view, Russell turned around and headed back to the Dous-
man Express, but when he arrived, the three men and the
truck were gone.

Meanwhile, Officer Benjamin Harvath was also on patrol
in a nearby neighborhood. Harvath had been a member of the
Green Bay police force for four years, during which he had
received training on drug interdiction. Like Russell, Harvath
had received the email about suspicious narcotics activity at
826 Kellogg Street. Harvath also knew about drug trafficking
in that area of Green Bay because he had previously discov-
ered narcotics during traffic stops on Kellogg Street.

According to Harvath, "this area of Bravo district is one that is known to me and other officers to be of heightened drug activity."

At approximately 1:30 a.m., while driving east on Kellogg Street, Harvath noticed a Dodge Ram truck parked near 826 Kellogg Street, facing west. The truck's engine was running, but its lights were turned off, and Harvath thought he saw two people inside the vehicle. Harvath drove by the truck, made a U-turn, and then drove by again. This time, he saw a third person (later revealed to be Yang) a few houses away walking towards the truck from the direction of 826 Kellogg Street.

Harvath became suspicious because he knew that neighborhood did not experience much foot traffic, and no other vehicles or pedestrians were around this early in the morning. Harvath also knew from his training and experience that drug purchasers often park down the block from a dealer's home to avoid suspicion or association with a particular house. Temperatures that morning were at or below freezing. So, Harvath could "think of no other reason why the driver of the pick-up would park and make his passenger walk to his location, as opposed to driving up to the house from which he had emerged," per the district court.

Harvath radioed his suspicions to other officers in the area. As he did so, the driver of the truck turned on its headlights, drove away from the curb, and turned south onto North Oakland Avenue. After the truck was out of view, Harvath made a second U-turn on Kellogg Street and pursued it. The remainder of the encounter is recorded on Harvath's patrol car dashcam.

After a few seconds in pursuit, Harvath witnessed the truck roll through a stop sign at the corner of North Oakland Avenue and Dousman Street. His dashcam video depicts the truck's brake lights activating near the stop sign, but the video is grainy and out of focus, so the footage is unclear as to whether the truck came to a full and complete stop. Moments after the truck turned west onto Dousman Street, Russell responded to Harvath's prior radio message. Russell informed Harvath that he witnessed a similar Dodge Ram earlier in the evening involved in suspicious activity, and that its passengers were "being shady." At this point, as the truck turned south onto Ashland Avenue, Harvath announced his intention to stop the vehicle.

The truck pulled into a restaurant parking lot on Ashland Avenue. With his patrol car lights activated, Harvath parked behind the truck. Within a few seconds, Russell also arrived and positioned his patrol car next to Harvath's vehicle. Russell's dashcam recorded the Dodge Ram from an angle virtually identical to Harvath's.

When Harvath approached the driver's door, he saw three men seated on a bench seat in the front of the truck—the driver Adam Zimdars, the middle-seat passenger Justin Taylor, and the window-seat passenger Yang. Harvath questioned Zimdars about his plans and the origin of his trip. Harvath then explained that the truck was stopped for the traffic violation at the stop sign and a burnt-out license plate light.[1] He asked Zimdars for his identification. Before Zimdars could reach for his wallet, though, Harvath asked if there were any

---

[1] Before the district court, the Government did not rely on the lamp light as a justification for the stop.

weapons in the vehicle. Zimdars responded equivocally. He said he was not "aware" of any weapons in the car and that he did not personally "have a gun." This further raised Harvath's suspicions. After obtaining Zimdars' identification, Harvath called for a canine unit, returned to his patrol car, and worked with dispatch to process the men's driving records and check for warrants.

Meanwhile, Russell had approached the passenger side of the truck and spoke with Yang and Taylor. Russell told the passengers that earlier in the evening he had seen them with a chainsaw and the Dodge Ram at the Dousman Express. Because neither passenger was wearing a seatbelt, Russell also asked for their identification information, which he later provided to Harvath. Throughout his questioning, Russell repeatedly told Yang to keep his hands visible, as Yang frequently put them down and out of Russell's view.

While Harvath was waiting in his patrol car for dispatch to process the identification information, a canine unit arrived. Russell then opened the Dodge Ram's passenger door and instructed the occupants to exit. At this point, according to Russell, Yang became visibly pale and his shoulders slumped down. As Yang exited the truck, Russell again ordered him to keep his hands where Russell could see them. Yang did not comply and reached for his waist, which prompted Russell to grab Yang's hands and press him up against the side of the truck. Yang fought back, and Harvath ran from his patrol car to help Russell. During the struggle, a handgun fell from Yang's waistband, along with a package containing methamphetamine and marijuana. Russell saw the gun and shouted to alert the other officers. As Yang broke free

from the officers' grasp and attempted to flee the scene, Harvath subdued Yang with a taser.

After Yang was placed under arrest, the officers found additional methamphetamine in the Dodge Ram. The drug-detection dog remained in the canine squad car throughout the stop. The entire episode—from Harvath's first communication with the truck's occupants to the start of the altercation—lasted less than six minutes, according to Harvath's dashcam video.

A federal grand jury indicted Yang for possession with intent to distribute methamphetamine, possession of a firearm in furtherance of a drug-trafficking crime, and two other gun offenses. Yang moved to suppress all physical evidence found on his person and in the Dodge Ram, arguing that officers lacked specific and articulable facts under the Fourth Amendment to justify the traffic stop. At Yang's request, the district court held an evidentiary hearing on the motion, at which Harvath and Russell testified.

After post-hearing briefing, the district court denied Yang's motion to suppress. The court ruled that Harvath had two independent grounds to justify the stop. First, there was reasonable suspicion to believe that a traffic violation had occurred. While acknowledging that "one cannot discern from the video taken by the dashboard camera of Officer Harvath's squad car whether the truck came to a complete stop," the court found "the testimony of both police officers credible," and credited Harvath's testimony recounting his personal observation of the truck rolling through the stop sign. "It is not foreign to human experience," the court stated, "for personal observation in matters involving motion, distance, and

perspective to be more clear when viewed live than from a video recording."

Second, the court held that the stop was justified under *Terry v. Ohio*, 392 U.S. 1 (1968), because Harvath testified to specific and articulable facts providing reasonable suspicion of unlawful drug activity. These facts included the time of night; the truck engine running with its headlights turned off; the location being "less than two blocks away" from a house with suspected drug activity (826 Kellogg Street); and Yang's walking towards the parked truck from a measurable distance despite the freezing temperatures—a common tactic for drug deals which Harvath knew from his training and experience. While Yang argued that each individual fact had an innocent explanation, the court reasoned that those facts must be examined under the totality of the circumstances. Applying that standard, the court concluded "Harvath had a reasonable suspicion that criminal activity 'may be afoot' when he stopped the pick-up truck and questioned its occupants." (citation omitted) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

As a final matter, the court noted the short duration "from the time the officers approached the truck until Yang was arrested." Because Harvath was attempting to verify the identities of the truck's occupants when the physical altercation ensued, the court concluded "[n]either officer prolonged the stop beyond the time needed to address the concerns that gave rise to it."

Following the denial of his motion to suppress, Yang entered conditional pleas of guilty to the charges of possession of methamphetamine and possession of a firearm in furtherance of drug trafficking, while the other two counts were

dismissed at sentencing. The plea agreement preserved his right to appeal the court's denial of his motion to suppress. Yang was sentenced to 111 months' imprisonment.

## II

### A

On appeal, Yang contends the traffic stop was not supported by reasonable suspicion in violation of the Fourth Amendment. When evaluating the denial of a motion to suppress, we review the court's factual findings for clear error, while legal conclusions and mixed questions of law and fact are reviewed de novo. *United States v. Gholston*, 1 F.4th 492, 496 (7th Cir. 2021). "A factual finding is clearly erroneous only if, after considering all the evidence, we cannot avoid or ignore a 'definite and firm conviction that a mistake has been made.'" *United States v. Burnside*, 588 F.3d 511, 517 (7th Cir. 2009) (quoting *United States v. Marshall*, 157 F.3d 477, 481 (7th Cir. 1998)).

"[T]he ultimate touchstone of the Fourth Amendment is reasonableness." *United States v. Price*, 28 F.4th 739, 748 (7th Cir. 2022) (alteration in original) (quoting *Riley v. California*, 573 U.S. 373, 381 (2014)). "Reasonableness, in turn, is measured in objective terms by examining the totality of the circumstances." *United States v. Cole*, 21 F.4th 421, 427 (7th Cir. 2021) (en banc) (quoting *Ohio v. Robinette*, 519 U.S. 33, 39 (1996)). As traffic stops are seizures, they must be reasonable under the circumstances. *Id.* Because "a routine traffic stop is 'more analogous to a so-called *Terry* stop … than to a formal arrest,'" *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (quoting *Knowles v. Iowa*, 525 U.S. 113, 117 (1998)), only reasonable suspicion of wrongdoing is required. *Cole*, 21 F.4th at

427. Although a mere hunch will not suffice, "the level of suspicion the standard requires is 'considerably less than proof of wrongdoing by a preponderance of the evidence,' and 'obviously less' than is necessary for probable cause." *Navarette v. California*, 572 U.S. 393, 397 (2014) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). Rather, an officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion." *United States v. Rodriguez-Escalera*, 884 F.3d 661, 668 (7th Cir. 2018) (alteration in original) (quoting *Terry*, 392 U.S. at 21).

When assessing reasonable suspicion under the totality of the circumstances, courts should not engage in a "divide-and-conquer analysis." *District of Columbia v. Wesby*, 138 S. Ct. 577, 588 (2018) (quoting *Arvizu*, 534 U.S. at 267). Factors supporting reasonable suspicion may be discussed separately, but courts must still "consider the reasonable inferences that a law enforcement officer could draw from the objective facts in combination" rather than "examin[ing] each factor … in isolation." *Rodriguez-Escalera*, 884 F.3d at 668.

The Government offers two independent grounds for why Harvath stopped the truck, either of which would render the seizure constitutionally permissible. First, Harvath had a reasonable suspicion that a traffic violation had occurred. Second, Harvath pointed to specific and articulable facts supporting a reasonable suspicion that the occupants of the Dodge Ram were involved in illicit drug activity.

The district court twice found Harvath's testimony credible, in which he recounted his personal observation of watching the Dodge Ram roll through a stop sign at the corner of North Oakland Avenue and Dousman Street. Importantly,

when evaluating an officer's testimony regarding traffic infractions, "[t]he question … is whether [the officer] reasonably believed that he saw a traffic violation, not whether [the defendant] actually violated the [law]." *Cole*, 21 F.4th at 428. "We accord special deference to the district court's credibility determinations because the resolution of a motion to suppress is almost always a fact-specific inquiry, and it is the district court which heard the testimony and observed the witnesses at the suppression hearing." *United States v. Bebris*, 4 F.4th 551, 560 (7th Cir. 2021) (quoting *Burnside*, 588 F.3d at 517).

Yang makes various challenges to Harvath's credibility. He insists the dashcam video from Harvath's patrol car shows the truck came to a complete stop. But that video is grainy and out of focus, and while it depicts the truck's brake lights turning on temporarily, it does not demonstrate that the truck came to a complete stop, as opposed to slowly approaching and passing through the intersection.

Yang argues that the dashcam video shows two cars crossing the intersection perpendicular to the Dodge Ram, which proves that the truck must have fully stopped. But again, the low-quality video footage does not confirm the truck's distance from the intersection, nor does it establish whether the vehicle was stopped or slowly moving forward when the other cars crossed. In fact, the video reveals that the truck's brake lights were off as the second car crossed the intersection, which could show that the Dodge Ram was in motion despite other traffic. Our review of the dashcam footage does not leave us with a "definite and firm conviction that a mistake has been made." *Burnside*, 588 F.3d at 517 (quoting *Marshall*, 157 F.3d at 481). And even if the video raised doubts as to whether a traffic violation occurred, the question is

whether our confidence is undermined that Harvath reasonably believed he witnessed a traffic violation, which it is not.

As a practical matter, Yang also contends that Harvath was not well positioned to observe whether the truck rolled through the stop sign. He suggests that Harvath's observations were made while he was driving several hundred feet behind the Dodge Ram, so it is improbable that Harvath could have seen the truck's tires spinning. But Yang failed to raise any of these questions or concerns at the evidentiary hearing. It is also contradictory for Yang to suggest that Harvath was not well positioned to see whether the truck was stopped, while also contending that a blurry video taken from Harvath's vantage point shows just that. None of the circumstances Yang raises provide an adequate basis for disturbing the district court's credibility determinations.

Yang further contends Harvath equivocated as to whether he saw the truck roll through the intersection without stopping. But Yang's only basis for this contention is that Harvath testified he "perceived" a traffic infraction—a term Yang says denotes uncertainty. But "perceived" does not inherently imply indecision in perception, and multiple times in the record Harvath testified the truck did not fully stop.[2]

Yang offers only one argument that directly calls into question Harvath's credibility. According to Yang, when Harvath pulled the truck over, Harvath informed Zimdars that

---

[2] Dist. Ct. D.E. 22 at 25 (Q: "[D]id the Dodge Ram come to a complete stop?" A: "No, it did not."); R. 22 at 30 (Q: "[W]hat you're saying is a rolling stop, an incomplete stop?" A: "Yes."); *id.* at 44 (Q: "Officer Harvath, … you thought … the vehicle went through an intersection without stopping, … is that correct?" A: "That's accurate, yup.").

one of the license plate lights was burnt out. But at the evidentiary hearing, Harvath admitted his dashcam video depicts "the light bulb on the driver's side is illuminating the plate." Yang suggests this shows that Harvath was predisposed to seeing traffic violations that did not occur. But as the district court correctly noted, neither Harvath's testimony nor the video footage touch on the passenger-side license plate light, leaving the "possibility that a second lamp on the passenger side was out." Yang does not address this possibility, and the record is silent on whether the passenger-side license plate light was functioning. Without more, the district court's credibility determinations stand.

While Harvath's reasonable suspicion that a traffic violation had occurred is sufficient to uphold the stop, the officers also had reasonable suspicion, under the totality of the circumstances, to believe that the truck's occupants were engaged in unlawful drug activity. The events unfolded in a residential neighborhood at 1:30 a.m. with low foot traffic and no other pedestrians. Harvath knew—from his personal experience and the email he had received five days earlier about 826 Kellogg Street—that this neighborhood experienced heightened drug trafficking. A Dodge Ram was parked with its engine on and lights off less than two blocks away. Yang was walking towards the truck from that address. Even though it was dark with freezing temperatures, the driver of the truck waited for Yang to reach the vehicle, which Harvath knew was consistent with illegal drug activity. After Harvath made his second U-turn and returned to that location, the truck and Yang were gone. As Harvath followed the truck, Russell relayed over the radio that Russell had seen a Dodge Ram earlier that night and thought the occupants acted "shady." These specific and articulable facts, taken together

with all rational inferences from those facts, reasonably warranted the stop.

Yang responds that many of these facts have innocent explanations. He suggests that police intelligence identifying 826 Kellogg Street as a suspected drug house might have been thin, Yang might not have been walking from that address, the Dodge Ram's lights might have been off for innocuous reasons, and Yang might not have been walking to the truck.

Although Yang offers alternative explanations for these facts, he does not demonstrate why Harvath's inferences from the facts were unreasonable. It has been "consistently recognized that reasonable suspicion 'need not rule out the possibility of innocent conduct.'" *Navarette*, 572 U.S. at 403 (2014) (quoting *Arvizu*, 543 U.S. at 277). While Yang explains why Harvath might have drawn alternative inferences from what he observed, conduct explained by another, innocuous cause does not negate reasonable suspicion. *Id.* Moreover, while Yang's analysis effectively shows that any individual factor would not independently give rise to a reasonable suspicion of wrongdoing, his piecemeal approach does not overcome the cumulative weight of the specific and articulated facts known to Harvath, which is what a totality-of-the-circumstances approach demands.

Yang discusses in detail one fact he believes the district court improperly considered. Yang is correct that, per the audio from Harvath's dashcam, Russell is only heard to tell Harvath that the Dodge Ram's occupants were "being shady." But it is uncertain if Russell ever relayed to Harvath the basis for this belief, including that Russell saw the truck's occupants with a chainsaw and that Yang had given Russell suspicious looks. Yet this argument proves too little. The district

court provided a detailed analysis of the facts known to Harvath before concluding that he had reasonable suspicion to stop the truck, and Russell's prior encounter with Yang was not a factor in the court's evaluation. Only after concluding that Harvath had reasonable suspicion did the court reference Russell's encounter as "additional grounds for suspicion." Thus, the court did not improperly impute Russell's knowledge to Harvath as a justification for the stop.

Because Harvath had reasonable suspicion to believe both that the driver of the Dodge Ram had committed a traffic violation and that the truck's occupants were engaged in illegal drug activity, we conclude that the stop was justified under the Fourth Amendment.

**B**

For the first time on appeal, Yang contends that officers unlawfully extended the duration of the stop. He points to a number of questions Harvath asked, which related to the occupants' travel plans that evening, the owner of the Dodge Ram, and whether anyone in the truck had any weapons. Yang also criticizes Russell for asking the passengers about their presence at the Dousman Express with a chainsaw, as well as his request for identification information. None of these questions, Yang contends, related to the rolled stop sign, and thus they unlawfully prolonged the seizure.

Yang's argument fails for three reasons. First, he waived it. "Waiver occurs when a party intentionally relinquishes a known right and forfeiture arises when a party inadvertently fails to raise an argument in the district court." *United States v. Flores*, 929 F.3d 443, 447 (7th Cir. 2019). Here, in response to the district court's invitation to the parties to provide an

overview of the issues at the evidentiary hearing, the Government stated that the stop was justified and "that it wasn't prolonged." Yang's attorney responded that Yang was challenging the basis for the stop, "[n]ot so much arguing that it was extended." That response was borne out in the post-hearing briefing, in which Yang did not argue that the duration of the stop was unconstitutional.

This record shows that Yang intentionally relinquished the right to challenge the duration of the stop. Yang quibbles that the phrase "[n]ot so much arguing" is "hardly an express, unequivocal, and intentional relinquishment of Yang's argument." But the Government affirmatively raised the duration of the stop, which was met with Yang's attorney denying that the issue was being raised. This was followed by briefing that failed to mention the subject. So, the phrase "[n]ot so much arguing" constitutes an intentional relinquishment of the point. Even if Yang's contention was forfeited rather than waived, Yang has made no effort to show that his argument survives under the demanding standard of plain-error review. *See United States v. Thomas*, 933 F.3d 685, 690 (7th Cir. 2019) (describing the standard for plain-error review).

Second, Yang's prolonged-stop argument fails because it is based on the faulty premise that the only justifiable purpose for the stop was to explore the traffic violation. But as Yang's appellate counsel conceded during oral argument, none of the questions that Harvath and Russell asked would be inappropriate if the purpose of the stop was to investigate illicit drug activity.[3] Because Harvath had reasonable suspicion to

---

[3] Oral Arg. at 15:13–25.

investigate the individuals for involvement with illegal drugs, the questions fell within the scope of the traffic stop's mission.

Third, even if we assumed that Harvath only had reasonable suspicion to investigate a traffic violation, the questions the officers posed were still constitutionally permissible. As our court recently emphasized in *Cole*, the duration of a stop is determined by the seizure's mission, which is "to address the traffic violation that warranted the stop and attend to related safety concerns." 21 F.4th at 428 (quoting *Rodriguez*, 575 U.S. at 354). Tasks that fall within the mission of a traffic stop include "'determining whether to issue a traffic ticket' and pursuing 'ordinary inquiries incident to [the traffic] stop.'" *Id.* (alteration in original) (quoting *Rodriguez*, 575 U.S. at 355). These ordinary inquiries include "'inspecting the automobile's registration and proof of insurance'" and "travel-plan questions," provided they "remain reasonable … based on all the circumstances." *Id.* at 428, 430 (quoting *Rodriguez*, 575 U.S. at 355).

Each question Yang challenges is in line with inquiries we have recognized as permissible. Harvath's first four questions—"[W]hat are you guys doing tonight?", "What were you doing parked over on Kellogg and Ashland there?", "Where were you at before then?", and "[W]hat's going on tonight? Is there some occasion?"—all relate to where the truck's occupants had driven from and where they were headed, which are permissible travel-plan questions under *Cole*. Next, Harvath asked who owned the Dodge Ram, which is part of the standard license-and-registration inquiry. Last, before Zimdars looked for his identification, Harvath asked whether any weapons were in the truck. This question was

proper because it concerned officer safety and was directly related to his request for production of documentation.

Russell's questions did not extend the duration of the stop because he made his inquiries while Harvath questioned Zimdars and while Harvath processed the men's identification information with dispatch. And "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop … do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009). So, Yang's challenge to the duration of the stop fails.

We hold that the traffic stop was predicated on reasonable suspicion of wrongdoing. Further, Yang cannot show the officers unlawfully extended the stop's duration. We therefore AFFIRM the judgment of the district court.