In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-1490

D.Z., by his Next Friend,
A. Thompson,

*Plaintiff-Appellant,*

*v.*

MARK BUELL,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12 C 7580 — **Daniel G. Martin**, *Magistrate Judge.*

ARGUED NOVEMBER 14, 2014 — DECIDED AUGUST 6, 2015

Before BAUER, FLAUM, and TINDER, *Circuit Judges.*

BAUER, *Circuit Judge.* Plaintiff-appellant, D.Z., a minor, filed suit under 42 U.S.C. § 1983, claiming that defendant-appellee, Evanston Police Officer Mark Buell ("Buell"), violated his rights under the Fourth Amendment when he detained D.Z. in connection with a reported burglary. Buell moved for summary judgment, raising, *inter alia*, the defense of qualified immunity. The district court granted Buell's motion, finding

that Buell's stop of D.Z. was supported by reasonable sus-
picion and that, assuming that D.Z.'s detention amounted to a
custodial arrest, Buell was entitled to qualified immunity
because he had arguable probable cause to arrest D.Z. We
affirm.

## I. BACKGROUND

On August 30, 2012, a resident in Evanston, Illinois,
reported that she had observed a burglar in her home. She
described the intruder to a police dispatcher as a "young boy,
African American, [wearing] cargo khaki shorts, dark brown
T-shirt or [a] dark shirt." Additionally, she told the dispatcher
that she had observed the intruder running northbound down
an alley. The dispatcher relayed the description of the intruder
on the police dispatch radio, describing the suspect as a "black
male, probably in his teens, wearing a dark shirt, and khaki
cargo shorts."

Buell, in addition to several other Evanston police officers,
heard the broadcast while he was driving with a fellow officer,
Russell Brown. Upon hearing the broadcast, which did not
include any detail about the direction of flight that the suspect
took, the officers drove toward the location of the burglary. As
they were searching in the area, one of them noticed an
individual on a bicycle matching the suspect's description at a
nearby intersection heading east. After notifying the police
dispatcher of the sighting, the officers attempted to catch up to
the cyclist but were unable to do so. Shortly thereafter, the
dispatcher sent out a second description of the suspect,
describing him as "a male, black juvenile with a dark shirt and
khaki, uh, shorts or pants, cargo pants." Another officer alerted

dispatch that he had spotted an individual on a bicycle at an intersection just south of the victim's house. The officer stopped the individual and detained him until the burglary victim could come to the scene for a "show up." When she arrived, however, she stated that the person who had been stopped was not the individual who had entered her home. The officer radioed to say that no other units were needed, and the search continued.

Around the same time, Officer Amy Golubski reported a suspect riding a bicycle near Chute Middle School, which is located less than a half mile south of the scene of the burglary. She described the cyclist—D.Z.—as riding a blue bike and wearing "cargo shorts [unidentifiable] dark navy or black … [and] a light gray tank top, blue cap." Golubski was directed by someone over the radio to "put a stop" on the individual, so she exited her vehicle and pursued D.Z. on foot. Ultimately, Golubski was unable to catch up to D.Z., who rode his bike through the field in front of the school (a shortcut that he regularly took to get home). Buell heard Golubski on the radio state that she could not catch the suspect and spotted Golubski heading back quickly to her car. Both Buell and his partner stated that Golubski sounded out of breath over the radio, leading them to believe that D.Z. had tried to evade her.

Buell then attempted to catch D.Z. by turning down a nearby street. He spotted D.Z. riding his bicycle and turning into the driveway of a home located less than a half mile from the victim's home. Buell stated that he saw D.Z. turn and look in his direction, before getting off his bike and heading to a fence at the top of the driveway. Unaware that the residence was D.Z.'s own, Buell sent out a radio dispatch that the suspect

was "cutting through the yards," then exited his vehicle and pursued D.Z. on foot. Buell stated that he saw D.Z. put his hands on the fence, which led Buell to conclude that D.Z. was trying to flee. Buell ordered D.Z. to stop and put his hands up, an order that D.Z. promptly obeyed, and Buell placed him in handcuffs. Buell subsequently brought D.Z. to the front of the driveway and radioed for the burglary victim to be brought to the scene for another "show up." The victim arrived shortly thereafter and stated that D.Z. was not the intruder, at which point D.Z. was released.

D.Z. brought this action against Buell, pursuant to 42 U.S.C. § 1983, alleging that Buell violated his rights under the Fourth Amendment when he detained him on August 30, 2012. D.Z. also alleged various state-law claims against Buell and brought suit against the City of Evanston, alleging a "failure to train" claim, pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), and several state-law claims. D.Z. voluntarily dismissed his *Monell* claim against the City of Evanston and moved for summary judgment on his Fourth Amendment claims against Buell, which the district court denied. Buell also moved for summary judgment, raising the defense of qualified immunity as to D.Z.'s Fourth Amendment claims and state-law immunity as to D.Z.'s state-law claims. The district court granted Buell's motion for summary judgment, finding that Buell had reasonable suspicion to stop D.Z. and, assuming that D.Z.'s detention amounted to a custodial arrest, that Buell was entitled to qualified immunity because he had arguable probable cause to arrest D.Z. As to D.Z.'s state-law claims against Buell, the district court declined to exercise supplemental jurisdiction

and dismissed those claims without prejudice. This appeal followed.

## II. DISCUSSION

D.Z. contends that the district court improperly granted summary judgment to Buell on his § 1983 claims. He argues further that the district court erred in not considering the testimony and affidavits of his proffered expert. We review *de novo* the district court's grant of summary judgment. *Catlin v. City of Wheaton*, 574 F.3d 361, 365 (7th Cir. 2009). Summary judgment is appropriate when, after viewing the facts in the light most favorable to the non-moving party, the court finds that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. We also review *de novo* a qualified immunity determination, *Siliven v. Ind. Dep't of Child Servs.*, 635 F.3d 921, 925 (7th Cir. 2011), and review the district court's decision not to consider the testimony of D.Z.'s expert witness for an abuse of discretion, *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003).

### A. Qualified Immunity

"Qualified immunity protects public officials from liability for damages if their actions did not violate clearly established rights of which a reasonable person would have known." *Catlin*, 574 F.3d at 365. Neither party disputes that D.Z.'s constitutional right to be free from unreasonable seizure was clearly established at the time of the incident. Thus, since the law was clear at the time of the incident, the only question is whether Buell violated D.Z.'s constitutional rights when he stopped and detained him on August 30, 2012. The district court followed the parties' preference in dividing the analysis

into whether Buell had reasonable suspicion to stop D.Z., and the separate question of whether he had probable cause to arrest D.Z. In the interest of consistency, we will do the same.

The Fourth Amendment prohibits unreasonable searches and seizures, but police may conduct an investigatory stop of an individual when the officer has reasonable suspicion that a crime has occurred. *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968). Such stops, referred to as *Terry* stops, need not be supported by probable cause; rather, they are permissible as long as officers have a "reasonable articulable suspicion that criminal activity is afoot." *United States v. Riley*, 493 F.3d 803, 808 (7th Cir. 2007) (quoting *United States v. Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006)); *see also Terry*, 392 U.S. at 21–22. Reasonable suspicion is more than a hunch—when an officer initiates a *Terry* stop, he must be able to point to specific facts that suggest that a stopped individual has committed, was committing, or is about to commit an offense. *Jewett v. Anders*, 521 F.3d 818, 823 (7th Cir. 2008); *Lawshea*, 461 F.3d at 859.

In evaluating whether an officer had the requisite reasonable suspicion to support a *Terry* stop, we must look at "the totality of the circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect." *Lawshea*, 461 F.3d at 859. For this reason, certain behavior that may seem innocent under some circumstances, may amount to reasonable suspicion when viewed in the context at play at the time of the stop. *United States v. Grogg*, 534 F.3d 807, 810 (7th Cir. 2008) (citing *Lawshea*, 461 F.3d at 859). The standard is objective and asks, "would the facts available to the officer at the moment of the seizure … warrant a man of reasonable caution in the belief

that the action taken was appropriate?" *United States v. Tilmon*, 19 F.3d 1221, 1224 (7th Cir. 1994) (internal citations and quotations omitted). An officer's subjective intent does not factor into this analysis. *United States v. Barnett*, 505 F.3d 637, 639–40 (7th Cir. 2007).

Given the totality of the circumstances and the information known to Buell at the time that he stopped D.Z., we agree with the district court that Buell had reasonable suspicion to initiate an investigatory stop. Buell responded to a police dispatch that included five, specific identifying characteristics—race, age, gender, shirt color, and type of shorts. While D.Z. argues that this broadcast was too broad, such descriptions are not to be viewed in isolation—the question of whether reasonable suspicion exists goes beyond a suspect's description, and may include such factors as the temporal and geographic proximity of the stop to the reported crime, and the behavior of the suspect.

The evidence shows that within minutes of the police dispatch, Buell and his partner headed toward the scene of the burglary to look for the suspect in the area. Not having been told that the suspect ran northbound down an alley, the officers spotted an individual just south of the victim's home who somewhat matched the description of the suspect and who was heading east on a bicycle. After relaying this information over the radio, Buell, his partner, and other officers in the area, began their search in the area immediately south of the victim's home—not an unreasonable decision, given the fact that the bicyclist bore a resemblance to the dispatcher's description of the suspect and was spotted heading away from the residence in the immediate vicinity of the victim's home,

just minutes after the 911 call. D.Z., who matched most of the five specific identifying characteristics to some extent, was also riding his bike that afternoon, less than a quarter mile south of the victim's home, minutes after the 911 dispatch. Buell heard Golubski's dispatch and knew that she attempted to put a stop on D.Z. and failed.

Based on a number of his own observations, Buell reasonably concluded that D.Z. had tried to evade Golubski. Although it is undisputed that D.Z. was actually unaware that Golubski tried to stop him, Golubski did not state over the radio that D.Z. was oblivious to her pursuit, she merely reported that she could not catch him and that she would have to "drive around." Buell testified that he saw Golubski head quickly back toward her vehicle when she couldn't reach D.Z. and believed that she sounded out of breath when she told dispatch that she was unable to make the stop.[1] It is objectively reasonable for an officer to conclude, based on a fellow officer's breathless tone of voice and behavior after unsuccessfully attempting to stop a suspect, that the suspect was deliberately trying to evade the officer. Thus, coupled with D.Z.'s characteristics and proximity to the crime, Buell's belief that D.Z. had tried to outrun the police gave him reasonable suspicion to stop D.Z.

---

[1] Although D.Z. argues that whether Golubski ran or walked back to her car is a disputed fact, he presents no evidence to support this contention. We agree with the district court that Golubski's statements regarding her attempted stop of D.Z. are not contradictory and that Buell's contention that he saw Golubski head quickly to her car is supported by the record.

We now move on to the separate question of whether or not Buell had probable cause to arrest D.Z. The Fourth Amendment guarantees the constitutional right to be free from arrest without probable cause. *See Baker v. McCollan*, 443 U.S. 137 (1979). "Probable cause is a common-sense determination, measured under a reasonableness standard." *Humphrey v. Staszak*, 148 F.3d 719, 726 (7th Cir. 1998). A police officer has probable cause to arrest a suspect if, at the time of the arrest, the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person in believing that the suspect has violated the law. *Beck v. Ohio*, 379 U.S. 89 (1964); *Wagner v. Wash. Cnty.*, 493 F.3d 833, 836 (7th Cir. 2007) (per curium). However, even if probable cause is lacking with respect to an arrest, an officer is entitled to qualified immunity if his subjective belief that he had probable cause was objectively reasonable. *Humphrey*, 148 F.3d at 726. Thus, when a defense of qualified immunity has been raised, we ask whether "the officer actually had probable cause or, if there was no probable cause, whether a reasonable officer could have mistakenly believed that probable cause existed." *Humphrey*, 148 F.3d at 725. In other words, we ask whether the officer had "arguable" probable cause. *Id*.

The district court did not address whether Buell arrested D.Z. or not; rather, it held that, even if an arrest took place, Buell was entitled to qualified immunity because he had arguable probable cause to effect an arrest. We agree. Buell's pursuit of D.Z. occurred immediately after he mistakenly, but reasonably, concluded that D.Z. had evaded Golubski. He then observed D.Z. turn into the driveway of a home, get off of his bike and head to the fence, which led him to conclude that D.Z.

was "cutting through the yards." Finally, he observed D.Z. place his hands on the fence, which led him to conclude that D.Z. was going to scale it.[2] Under these facts, Buell had arguable probable cause to effect an arrest. Although D.Z. was not actually trying to run from the police, Buell's mistaken conclusion that he was does not preclude this court from finding that Buell is entitled to qualified immunity. *See Edwards v. Cabrera*, 58 F.3d 290, 293 (7th Cir. 1995) ("Even if probable cause is lacking with respect to [an] arrest, despite the officers' subjective belief that they had probable cause, they are entitled to immunity as long as their belief was objectively reasonable."). Since we find that Buell reasonably believed, based on the behavior he observed, that D.Z. was trying to evade the police, Buell is entitled to qualified immunity.

---

[2]   D.Z. argues that the question of whether or not his hands were on the fence, as Buell maintains and Brown corroborated, is in dispute. We disagree. D.Z. argues that "[t]here is no plausible explanation as to why [he] would have needed to place his hands on top of a fence" because the latch was on the outside, facing him. However, D.Z. is silent on the issue of whether he did, in fact, put his hands on the fence at any time before Buell ordered him to stop. It is D.Z.'s responsibility to come forth with *specific facts* demonstrating that a genuine issue of material fact exists for trial, and he may not rely upon mere allegations and bare assertions to do so. *See Wollin v. Gondert*, 192 F.3d 616, 621 (7th Cir. 1999). Because he failed to present such evidence, even when the evidence is viewed in the light most favorable to D.Z., there is no basis to dispute that Buell saw D.Z. place his hands on the fence prior to the stop.

### B. Excluded Expert Testimony

D.Z. argues that the district court erred in not considering the statements of his proffered expert witness on summary judgment. Courts have wide discretion in deciding whether to admit expert testimony as part of summary judgment. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 704–05 (7th Cir. 2009). The district court disregarded the expert's statements for several reasons, the first of which being that D.Z. failed to discuss the expert's opinions in his brief below. Although D.Z. cited to the expert's report and deposition, the court found that he did so without any specificity or discussion. Because courts are "not required to scour the record looking for factual disputes … [or] to piece together appropriate arguments," *Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995) (internal quotations and citations omitted), the district court declined to consider D.Z.'s expert's statements.

The district court's decision does not constitute an abuse of discretion. At the summary judgment level, "the district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). The court is only tasked with deciding whether, based on the evidence of record, there is any material dispute of fact that requires a trial. *Id.* As D.Z.'s failure to cite to the expert's testimony with specificity left the district court to sift through hundreds of pages of expert testimony, it was not improper for the district court to decline to consider the expert's statements.

AFFIRMED