In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

Nos. 19-3500 & 20-1111

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

LOLA CHANG and EY LAO,

*Defendants-Appellants.*

———————————

Appeals from the United States District Court for the
Eastern District of Wisconsin.
No. 1:19-cr-00058-WCG — **William C. Griesbach**, *Judge.*

———————————

ARGUED OCTOBER 30, 2020 — DECIDED JUNE 4, 2021

———————————

Before MANION, ROVNER, and SCUDDER, *Circuit Judges.*

ROVNER, *Circuit Judge.* After sliding off the road on a snowy night, Lola Chang and Ey Lao were arrested after a police officer, originally approaching the car to check on their safety, grew suspicious and a search eventually turned up evidence of drugs and weapons. Chang and Lao both contend that the search violated their Fourth Amendment rights. Lao also challenged the district court's ruling prohibiting the introduction of Chang's later hearsay statement claiming

possession of and responsibility for all of the illegal items in the car. Although the defendants are correct that the officer's hunch alone was not sufficient justification for the seizure, other factors provided the reasonable suspicion necessary. Moreover, we have found no abuse of the district court's discretion in barring the hearsay evidence.

**I.**

As is often the case in Wisconsin, March came in like a lion on March 1, 2019, and the snow made road conditions so treacherous that the Brown County Sheriff's Department had to call its supervisors out to respond to reports of accidents and cars stuck in ditches. At around 11:30 p.m., Lieutenant Jason McAuly responded to such a report and found a black BMW sedan far off the roadway in the gore—the area between the exit ramp and the road. The car was turned perpendicular to the road. McAuly pulled up in front of the car, activated his emergency lights, and walked to the driver's side window. As he approached, Lao lowered the car window and told the officer that he had summoned a tow truck and that it was on its way. He reiterated this information several times. According to McAuly, Lao displayed mannerisms that the officer associated with nervousness—rapid speaking, shaky hands, quivering voice, and acting as though he was dismissing the officer and wanting him to leave. He was also speaking loudly and sharply to his passenger, co-defendant Chang. McAuly testified that these behaviors immediately aroused his suspicions and were counter to his experience over his twenty-four-year career that people who find themselves in trouble are ordinarily relieved when a police officer arrives. Shortly after McAuly arrived, Chang got out of the car and opened the trunk to retrieve a special eye bolt used for towing

the car. McAuly testified that he intended to stay with the pair and the car until help arrived to make sure they were safe and also to investigate whether the accident might have been the result of a traffic law violation.

McAuly asked both Chang and Lao for identification and asked that they remain in the vehicle. As he returned to his car to run their names through the database, Lao got out of the car. McAuly exited his squad car and told Lao to return to the vehicle. Lao seemed reluctant to do so, but McAuly remained standing outside his squad car until he complied.

McAuly's check of Lao and Chang's driver's licenses revealed that both had extensive recent felony criminal histories and that both were under extended state supervised release for methamphetamine drug convictions. Upon McAuly's request, Sergeant Timothy Johnson arrived ten minutes later to provide back up.

Lao consented to a pat-down search which revealed a light pen used to detect counterfeit bills and a set of keys on a lanyard. Chang, who had been hunched with her head down and eyes lowered, also consented to a search. She claimed to have a bottle, but when McAuly conducted the search, he discovered that under her shirt she was carrying a small, locked, portable gun safe, with a corner of a plastic bag sticking out.[1] He also found, concealed in her bra strap, a large pocket knife with a spring-loaded blade. Chang denied both ownership of the safe and knowledge of what was inside. When McAuly

---

[1] A personal portable gun safe is a small locked box (as small as 9"x6"x2") that often can be secured in place with a locking cord.

asked her if the safe had been abandoned, she responded, "yes."

McAuly testified that after discovering the knife and gun safe, he thought there might be drugs and more weapons present. He asked Sergeant Johnson to detain Lao while he looked through the windows of the car with his flashlight. In the front passenger door pocket, he saw a razor blade and a piece of cardboard which he associated with dividing or cutting drugs. In the driver's side door handle area, he saw a small plastic container that appeared to hold a white substance that he thought, it turns out incorrectly, might be drugs.

McAuly knew that Wisconsin Act 79 (Wis. Stat. § 302.113(7r)) authorizes a law enforcement officer, without consent, a warrant, or probable cause, to search any property under the control of a person who is under court supervision if the officer has a reasonable suspicion of criminal activity or a violation of a condition of release. Wis. Stat. § 302.113(7r).[2] Based on his understanding of this state law, McAuly concluded that he had authority to search the gun safe. McAuly found the key to the gun safe on the same ring as the key to the car, both of which were on Lao's lanyard. When McAuly opened the gun safe with the key, he found a large quantity of what appeared to be an illegal substance in multiple containers, a digital scale, and a scraping tool. The drugs were

---

[2] 2013 Wisconsin Act 79 created multiple statutes relating to searches by law enforcement officers of individuals on community supervision (e.g., parole, probation, extended supervision). *See State v. Euell*, 943 N.W.2d 352, 352 at n.4 (Wisc. Ct. App. 2020).

later tested and found to be 75.6 grams of methamphetamine. He placed Lao and Chang under arrest.

McAuly did a cursory search of the car on site and discovered that the small plastic container contained a toy and not drugs. A later search executed pursuant to a search warrant revealed a firearm, ammunition, and some methamphetamine materials in the glove box. The police subsequently obtained footage from Lao's cell phone in which he is holding up a baggie with a uniquely-shaped rock of methamphetamine which appeared to be identical to the one found in the safe. In the video he described how he had just purchased the methamphetamine from someone named "Lola."

Once at the Sheriff's station, the defendants received Miranda warnings and then participated in interviews. During this interview, Chang allegedly declared that everything in the safe belonged to her, although she was unable to describe its contents. According to the briefs, she stated, "I don't know whatever you just found in the car is mine. Everything you found in the car is mine. He had nothing to do with it." Lao Brief at 15 (citing R. 55 at 5–6, R. 72 at 3); Government Brief at 11 (citing Lao Brief).[3]

An indictment charged Lao and Chang with possession with intent to distribute fifty grams or more of actual methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A) and 18 U.S.C. § 2. Lao was also charged with possession of a firearm during and in relation to a crime involving drug-trafficking in violation of 18 U.S.C. § 924(c)(1)(A), and

_____

[3] This in-custody video statement from Chang does not appear to be part of the record. We discuss the effect of this lack of citation to the record evidence further in Section II.B. below.

with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924 (a)(2).

Chang filed a motion to suppress evidence seized from the stop, claiming that Lieutenant McAuly lacked a reasonable suspicion to detain her at the point in time when he asked Lao and Chang for their identification and instructed them to remain in the car. Lao filed a similar motion and joined Chang's arguments. After an evidentiary hearing, the court denied the motion to suppress, finding that the officers did not violate the defendants' Fourth Amendment rights.

Chang entered into a plea agreement but reserved the right to appeal the denial of her motion to suppress. Lao, in contrast, chose to go to trial. Before trial, the government moved in limine to exclude Chang's hearsay statements that Chang claimed exculpated him. The court held, however, that the statements did not fall within any hearsay exception and could not be admitted if Chang chose to invoke her Fifth Amendment right not to testify.

Before Lao's trial began, the government agreed to dismiss the charge of possession of a firearm during and in relation to a drug-trafficking crime (the § 924(c) charge). The jury convicted Lao on the remaining two counts. The district court sentenced Lao to the mandatory minimum of 180 months on the first count (drug possession), and 120 concurrent months on count three (felon in possession of a weapon) and a total of ten years' supervised release. After her plea, the court sentenced Chang to 111 months' imprisonment, concurrent with several state sentences, to be followed by five years' supervised release.

The defendants appeal the district court's denial of their motion to suppress and its ruling that Chang's out-of-court statements were inadmissible hearsay.

## II.

### A. The Motion to Suppress

Lao and Chang both argue that the district court erred by denying their motion to suppress the evidence found in the roadside and subsequent searches. They claim that Lieutenant McAuly detained and seized them in violation of the Fourth Amendment, and therefore all of the evidence that resulted from that illegal detention must be suppressed. We review the district court's legal conclusions de novo and the facts found on the way to that conclusion for clear error. *United States v. Cherry*, 920 F.3d 1126, 1132 (7th Cir. 2019). The defendants do not dispute any of the district court's findings of fact, including its finding that the officers were credible, therefore we focus only on the court's decision that the seizure and search were not unlawful.

The district court opined that Lao and Chang were not seized because they were already detained by the snow and accident and Lieutenant McAuly's directives added little additional restraint. The district court hedged its bet, however, by stating that even if they had been detained, the seizure was justified. We conclude that the district court's latter conclusion was correct: Chang and Lao were detained. McAuly asked both Chang and Lao to remain in the vehicle while he searched their license and criminal history information, he temporarily retained their driver's licenses, and when Lao exited the car, McAuly told him to return and remained standing outside his squad car until Lao complied. Taking into

account all of the circumstances surrounding the encounter, Chang and Lao would not have felt free to leave nor at liberty to ignore the police presence and go about their business. *Florida v. Bostick*, 501 U.S. 429, 437 (1991).[4]

Having determined that they were detained, the next step for the court is to determine whether the detention violated Lao and Chang's Fourth Amendment rights. In the run-of-the-mill traffic stop case, a court is often asked to evaluate whether the police officer had the necessary level of suspicion to stop the vehicle. We are guided by the keystone principle in roadside search cases that a police officer cannot stop a vehicle without probable cause or a reasonable suspicion of a violation of law. *Delaware v. Prouse*, 440 U.S. 648, 663 (1979). Here we have a slightly different presentation, as Lieutenant McAuly did not stop the car, but rather he came upon a car that had itself come to a stop facing the wrong direction after sliding off a snow-slick road. In either case, however, a citizen "may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds." *Florida v. Royer*, 460 U.S. 491, 498 (1983). *See also*, *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000) (An officer who has no reasonable suspicion or probable cause may approach an individual, but that person "has a right to ignore the police and go about his business.") (*citing Royer*, 460 U.S. at 498); *Rodriguez v. United States*, 575 U.S. 348, 355 (2015) (An officer "may conduct certain unrelated checks during an otherwise lawful traffic stop, [but]… may not do so in a way that prolongs the stop, absent

---

[4] Although we view this standard from the point of view of the reasonable detainee, we also note that Lieutenant McAuly testified that he would have stopped them if they had tried to leave. R. 52 at 49.

the reasonable suspicion ordinarily demanded to justify detaining an individual."); *City of Indianapolis v. Edmond*, 531 U.S. 32, 41 (2000) (noting that vehicle checkpoint cases have recognized only limited exceptions to the general rule that a seizure must be accompanied by some measure of individualized suspicion, and that a "general interest in crime control" is insufficient). Although an arrest requires probable cause that a crime has been committed, an officer without probable cause may conduct a brief, investigatory stop based on a lower standard—that is, the officer must have a reasonable suspicion of criminal activity, and that suspicion must be founded on articulable facts. *Terry v. Ohio*, 392 U.S. 1, 21, 27 (1968); *United States v. Cole*, 994 F.3d 844, 849 (7th Cir. 2021). Even this lower standard for a brief *Terry* stop, however, "requires more than curiosity, inchoate suspicion, or a hunch." *Cole*, 994 F.3d at 849; *see also Kansas v. Glover*, 140 S. Ct. 1183, 1187 (2020) ("a mere 'hunch' does not create reasonable suspicion"); *Terry*, 392 U.S. at 22 (explaining that stops based on "inarticulate hunches" violate the Fourth Amendment); *United States v. Eymann*, 962 F.3d 273, 282 (7th Cir. 2020) ("Reasonable suspicion requires more than an inchoate and unparticularized suspicion or 'hunch' … ."); *United States v. Rodriguez-Escalera*, 884 F.3d 661, 668 (7th Cir. 2018) (a reasonable suspicion "requires more than a hunch or inchoate suspicion").

Lieutenant McAuly testified that he initially approached the car to assess the safety of everyone at the scene. He also asserted other reasons for the stop—that he suspected that the driver may have violated a traffic statute, and that he had a "hunch" that "something was going on." R. 52 at 41. We can readily dismiss McAuly's "hunch" as insufficient for even a

brief detention. *See Terry*, 392 U.S. at 22, 27; *Cole*, 994 F.3d at 849.

We can also leapfrog over the district court's discussion about whether a police officer may request a driver's license when the police contact results from a "motorist assist" rather than an "investigative stop," and thus the officer has neither probable cause nor a reasonable suspicion to suspect a traffic violation or other unlawfulness. R. 35 at 7. The district court relied on a Wisconsin Court of Appeals case rather than Supreme Court precedent to opine about a situation which was not presented in this case—a motorist assist without any indicia of a traffic violation or other wrongdoing. R. 35 at 7-9. For our purposes, we can rely on the Supreme Court precedents cited above in our description of key Fourth Amendment principles, as applied to situations in which a law enforcement officer has a reasonable suspicion that a traffic violation or other unlawful conduct has occurred.

In short, we need not depend on McAuly's hunch, his generalized safety concerns, or even his assessment that Lao and Chang were behaving in a suspicious manner. The Supreme Court has determined that a court need not delve into the subjective motivations of the officer who effectuated the detention. *Whren v. United States*, 517 U.S. 806, 813 (1996). *Terry* applies an objective standard, in which we evaluate whether an officer would have the requisite reasonable suspicion given the totality of the circumstances. *D.Z. v. Buell*, 796 F.3d 749, 754 (7th Cir. 2015). *See also*, *Cole*, 994 F.3d at 849. Once McAuly saw the car that had spun off the road, he had a reason to suspect that a traffic violation may have occurred, and thus sufficient justification for a brief detention while he investigated further. In the ordinary course of events, cars do not slide off

the road, and many of the vehicles on the road that night were successfully navigating the conditions. Perhaps the driver was driving too fast for the icy conditions, or impaired. Of course it may also have been true that the conditions of the road were such that any car hitting that spot at that time also would have careened off the side of the road, despite following all traffic laws and driving as conditions warranted. But an officer need not be certain a violation has occurred, only reasonably suspicious. *Glover*, 140 S. Ct. at 1188 (noting that reasonable suspicion does not "demand scientific certainty"); *Navarette*, 572 U.S. at 403 (explaining that reasonable suspicion does not require that an officer "rule out the possibility of innocent conduct"). And beyond determining whether to issue a traffic ticket, an officer's mission includes "ordinary inquiries incident to [the traffic] stop." *Caballes*, 543 U.S. at 408. After stopping a car for a traffic violation, an officer may take other actions that help to ensure roadway safety, including checking the validity of driver's licenses, determining whether there are outstanding warrants against the driver, and inspecting the vehicle's registration and proof of insurance. *Rodriguez*, 575 U.S. at 355. Thus, McAuly had adequate justification to run a driver's license check based on a reasonable suspicion that a traffic violation had occurred.

Our conclusion that the car in the gore gave McAuly sufficient justification for a brief detention allows us to avoid the other morass of deciding whether talking fast, smoking, moving around a lot, and a quivering voice and harsh words between Lao and Chang were sufficient indicia of nervousness such that Lieutenant McAuly might reasonably suspect that some unlawfulness was afoot. A reasonable officer might surmise that all of these mannerisms and actions are also consistent with the stress that comes after sliding one's car into

an inescapable ditch in the midst of a snowstorm, or the nervousness that many people have when interacting with police. *See, e.g., United States v. Howell*, 958 F.3d 589, 600 (7th Cir. 2020) (noting that nervousness when interacting with police, "at least not as a categorical matter, does not create reasonable suspicion that a suspect is armed and dangerous"). Fortunately, we need not decide. Under an objective standard, McAuly's detention of Lao while he checked his driver's license did not violate Lao's Fourth Amendment rights, as a reasonable officer would have had, at a minimum, a well-founded suspicion that Lao had violated a traffic law.

Chang, as a passenger, however, had an independent set of rights. When a police officer stops a vehicle, the officer seizes everyone in the vehicle, including the passengers. *Brendlin v. California*, 551 U.S. 249, 255 (2007). Nevertheless, the Supreme Court has held that if "it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation," then the stop is a lawful detention of the passengers as well. *Arizona v. Johnson*, 555 U.S. 323, 327 (2009). "The police need not have, in addition, cause to believe any occupant of the vehicle is involved in criminal activity." *Id.* Therefore if Lao was lawfully detained for a brief investigatory stop, Chang was as well.

During the license check, McAuly learned that both Lao and Chang had extensive criminal histories and that they were currently under court-ordered supervision for methamphetamine drug convictions. Of course the fact of their prior records did not supply probable cause for a search, as this would mean that anyone with a previous criminal record could be arrested or stopped at will. *Beck v. Ohio*, 379 U.S. 89, 97 (1964). McAuly did not need probable cause however,

because McAuly asked for and received Lao's consent to perform a pat-down search. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) ("[O]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."). In the course of that search, Lt. McAuly found the counterfeit-detecting pen light, and a lanyard with a set of keys attached. McAuly also asked for and received Chang's consent for a pat-down search. That search revealed that Chang was holding, under her shirt, what appeared to be a gun safe with a part of a small plastic baggie sticking out of the corner, and had concealed in her bra strap a small knife with a spring-loaded blade.

To recap, reasonable suspicion of a traffic violation supplied the justification for the initial detention and consent supplied the permission for the pat-down search. And because there was no taint from an illegal detention, we have no reason to doubt the validity of the consent. *See United States v. Pedroza*, 269 F.3d 821, 827 (7th Cir. 2001) ("[I]f a seizure of a suspect, such as the pat-down search here, is illegal, the illegal seizure will vitiate the suspect's subsequent consent to a search unless the state proves that the consent resulted from an independent act of free will."). After those consensual searches, Lieutenant McAuly determined that the discovery of the knife and gun safe, along with Chang's odd responses to his questions, gave him reason to suspect the presence of drugs or guns. Sergeant Johnson then looked through the car window with a flashlight and saw the razor blade stuck in a piece of cardboard, which he associated with drug use or sale, and the small plastic container which he believed (errantly, it turns out) to contain drugs. *See Texas v. Brown*, 460 U.S. 730, 739–40 (1983) (an officer may look into a car with a flashlight

and view anything in plain sight without violating the Fourth Amendment). All of this, along with the counterfeit currency detector, was more than sufficient to allow the officers to search the locked gun safe. We conclude that these facts were sufficient to give the officers probable cause for a search of the safe. But even if these factors were insufficient for probable cause, Wisconsin Statute § 302.113(7r) authorizes a law enforcement officer to search the property of any person who is on community supervision based on a reasonable suspicion that the person is committing, has committed or is about to commit a crime or violation of a condition of release.[5] There is no doubt that the presence of the gun safe, the knife, the currency detector, the razor-blade, Chang's evasive answers about ownership of the safe, and the suspected container of drugs was sufficient to allow a reasonable officer to suspect that these two had violated a condition of release or a criminal statute. The opening of the safe, therefore, did not violate either Lao or Chang's Fourth Amendment rights and the district court properly denied the motion to suppress the evidence. Consequently, the subsequent search of the vehicle pursuant to a warrant obtained after their arrest bore no taint.

---

[5] Neither defendant has questioned the constitutionality of Wis. Stat. § 302.113(7r). This court has held that similar conditions of release do not violate the Fourth Amendment. *See, e.g., United States v. Armour*, 804 F.3d 859, 870 (7th Cir. 2015) (*citing United States v. Sines*, 303 F.3d 793, 801 (7th Cir. 2002)) ("Although it is true that persons on supervised release, like prisoners, do not relinquish all constitutional rights, those rights are not unfettered. A court may impose conditions of supervised release which implicate fundamental rights so long as those conditions are reasonably related to the ends of rehabilitation and protection of the public from recidivism.").

That search uncovered a firearm, and some other drug materials in the glove box.

## B. The Hearsay Statements

As Lao's case headed to trial, the Government moved the court to bar the admission of Chang's out-of-court statements in which she attempted to bear all of the culpability for the crime, thus exculpating Lao. The statement Lao wished to introduce came from Chang's police interview at the Sheriff's office shortly after her arrest. After being advised of her Miranda rights, Chang allegedly told the interviewing officer that all of the "stuff" was hers. R. 21-1. Oddly, however, she could not describe the contents of the safe and when any drugs were placed into it. *Id.*; R. 55 at 5. She also allegedly stated: "I don't know whatever you just found in the car is mine. Everything you found in the car is mine. He had nothing to do with it," although, as we will discuss in a moment, these statements lack citation to record evidence. Lao wished to introduce these statements as evidence that the drugs and weapons were not his. The district court prohibited Lao from introducing these statements, concluding that the statements were not against Chang's penal interest and lacked sufficient indicia of trustworthiness. R. 110 at 220–21.

To overturn the district court's ruling on the admissibility of this hearsay statement, we would have to conclude that the district court abused its discretion. *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). The district court, however, was in a much better position to observe the proceedings and determine the impact of Chang's statements as a whole, and therefore, we will defer to the district court's determination unless it strikes us as fundamentally incorrect. *United States v. Ferrell*, 816 F.3d 433, 438 (7th Cir. 2015). This is particularly so in this

case where the district court presided over a somewhat unusual hearing in which Chang initially declared that she would testify, then changed her mind and opted to invoke her Fifth Amendment right not to testify, but in the process of doing so, engaged in a colloquy with the court about what her testimony might be. *See* R. 109 at 179–83.

The statement certainly meets the definition of hearsay: Lao wished to offer the out-of-court statements as true—to prove that Chang, not Lao, owned and controlled the drugs. Lao asserted that this statement fell within the "unavailable declarant" exception to the hearsay rule which allows the admission of hearsay evidence where (1) the declarant is unavailable; (2) the statement might expose the declarant to civil or criminal liability; and (3) it is supported by corroborating circumstances that clearly indicate its trustworthiness. *See* Fed. R. Evid. 804; *Ferrell*, 816 F.3d at 439. As the one seeking admission, Lao had the burden of demonstrating the satisfaction of each of these elements. *United States v. Jackson*, 540 F.3d 578, 588 (7th Cir. 2008).

Once Chang invoked her Fifth Amendment rights, she became an unavailable witness. The district court, however, concluded that the statements by Chang that all of the drugs were hers, both lacked corroborating circumstances of trustworthiness and were not against her interest. The court stated, "my ruling was both that it wasn't really against her interest to say that the drugs are not his. It would be against her interest certainly to say 'they're mine,' but they could be both." R. 109 at 221. But in fact, according to the government, when she was interviewed at the station she did indeed say, "the drugs are mine," and such a statement would, in fact, be against her penal interest at the time she made it.

Consequently, the district court erred by stating that the testimony Lao wished to present was not against Chang's penal interest. The district court was correct, however, that the statements lacked sufficient indicia of trustworthiness. This alone was sufficient reason for the district court to prohibit Lao from introducing them at trial. *See* Fed. R. Evid. 804(b)(3)(B); *Ferrell*, 816 F.3d at 439.

Before we begin discussing the substantive lack of trustworthiness, we should address whether the statements are in the record at all. Both parties refer to the following statement that Chang allegedly made during her interrogation at the Sheriff's office: "I don't know whatever you just found in the car is mine. Everything you found in the car is mine. He had nothing to do with it." The citations to this statement in the briefs are either missing or point to documents that eventually point to the Video of the Lola Chang Custodial Interview, which the government concedes is not in the record. *See* Government's Brief at 11, n.4. Although no party disputes the accuracy of Chang's statements or that they occurred, the fact that this court does not have any record citation for these statements, and no ability to assess their trustworthiness in context is one reason to question the reliability of the statements from the start.

The district court had other reasons to question the trustworthiness of the statements. The court reasoned that given the officer's initial concern about potential domestic abuse when he encountered the bickering couple, and the fact that Lao and Chang were "culturally" married, the court had reason to believe that Chang's statement might be the result of either coercion or affection. We agree with the district court's

assessment that this significantly decreased any confidence in the reliability of the statement.

Finally, although not explicitly articulated by the district court, Chang's statements lacked trustworthiness in other ways. When stopped on the side of the road, she denied any knowledge or ownership of the gun safe or its contents, despite having been concealing it under her shirt. Then, shortly after, at the Sheriff's office, she told Sergeant Tappen that "all of the stuff was hers." R. 21-1. And then later, during a motion in limine during Lao's trial, she took responsibility for the drugs in the car, but not the weapons. Her statements were also contradicted by videos taken from Lao's cell phone in which he holds up a methamphetamine rock which looks just like the uniquely shaped rock recovered from the safe and describes how he has just purchased it from "Lola." R. 109 at 139–42. Given the conflicting evidence, the district court clearly did not abuse its discretion in finding that the statements lacked the necessary indicia of trustworthiness.

Because the court did not err in its hearsay ruling and because the stop did not violate the defendants' Fourth Amendment rights, the opinion of the district court is AFFIRMED.