In the

# United States Court of Appeals

### For the Seventh Circuit

---

No. 21-1266

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

LEAMON SMITH,

*Defendant-Appellant.*

---

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 18 CR 732 — **Edmond E. Chang**, *Judge.*

---

ARGUED APRIL 13, 2022 — DECIDED APRIL 22, 2022

---

Before ROVNER, WOOD, and ST. EVE, *Circuit Judges.*

ST. EVE, *Circuit Judge.* Chicago police found a loaded handgun in Leamon Smith's underwear after a series of pat-downs during a traffic stop. The government charged Smith with being a felon in possession of a firearm, and he moved to suppress the gun. The district court concluded that the officer had reasonable suspicion to conduct each pat-down because of Smith's unusual body language throughout the stop: repeatedly leaning his pelvis against a car, waddling as if he had

something between his legs, and appearing unusually nervous. Smith entered a conditional guilty plea but reserved his right to appeal the suppression motion. As explained below, we affirm.

## I. Background

### A. Facts

On the night of June 18, 2018, at approximately 9:00 p.m., Leamon Smith was a passenger in Dalon Naylor's car when Chicago police officers pulled them over for running a red light. Officers Steven Holden and Dimar Vasquez turned on their body cameras as soon as they initiated the traffic stop. Officer Vasquez approached the driver's side of Naylor's vehicle, while Officer Holden approached Smith, who was sitting in the front passenger seat.

As Smith handed over his driver's license, Officer Holden commented that Smith was "shaking like a leaf." Officer Holden asked Smith to step outside and directed him to the back of the car. Smith complied but immediately rested the front of his pelvis against the car, even though he had not been asked to do so. In fact, Officer Holden asked Smith to take a half-step away from the car. Officer Holden then performed the first of three pat-downs. The initial pat-down focused on "hot spots," including Smith's waistband, front pockets, and lower leg—but not his groin area. Although Officer Holden did not find any contraband, he placed Smith in handcuffs and explained that he was simply being detained.

Officer Holden suspected right away that Smith was hiding something in his pants. After the first pat-down, Officer Holden told Smith, "If it's a little loud, we can work with it," using a slang term for cannabis. Smith responded that he had

"really nothing." Officer Holden then asked, "We're going to do this the hard way bro?" and told Smith, "Honesty goes a long way."

Next, Officer Holden asked Smith to walk from the back of Naylor's car to the front of the police car while he entered their names in a law-enforcement database. Officer Holden later testified that Smith "had that side-to-side walk, as if he was holding something in his crotch area and he was trying to walk around it, or hold it in place." Smith then rested his pelvis against the front of the police car. After running the name check, Officer Holden asked Smith to walk from the police car back to Naylor's car, where Smith again rested his pelvis on the car without prompting. Officer Holden offered to uncuff one of Smith's hands so that Smith could retrieve whatever he was hiding, but Smith declined. Officer Holden later testified that he did so in the hopes of building a rapport with Smith.

Meanwhile, Officer Vasquez was conducting a consent search of Naylor's car. Approximately six and a half minutes after the first pat-down, Officer Holden performed the second pat-down by jiggling Smith's pant legs. Nothing fell out. Officer Holden then asked Smith to walk back to the police car one more time. Officer Holden observed that Smith was walking with an exaggerated limp and asked if he was injured. Smith responded that he had been in a car accident and injured his right leg. Officer Holden later testified that Smith's more-pronounced limp was consistent with an item having "dropped" from his crotch.

About one minute after the second pat-down, Officer Holden conducted the third and final pat-down, this time focusing on Smith's groin area. Officer Holden felt a hard metal

object, which he removed from Smith's underwear and determined to be a loaded handgun. All told, approximately 11 minutes elapsed between the initiation of the stop and the discovery of the gun.

**B. Procedural History**

The government charged Smith with being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1), and Smith moved to suppress the gun. At the suppression hearing, Officer Holden testified that he "smelled the odor of fresh cannabis" as he approached the car, but he could not tell whether it was coming from the driver's side or the passenger's side. Officer Holden did not make note of this observation in his police report or comment on the smell of marijuana during the traffic stop. But Officer Vasquez did find a bag of marijuana tucked inside Naylor's pants.

The district court granted Smith's motion to suppress statements made after Officer Holden asked, "we're going to do this the hard way bro?" Of relevance to this appeal, however, the court denied his motion to suppress the gun itself. The district court concluded that the traffic stop was proper because both officers testified that Naylor's car ran a red light, and Smith presented no evidence to the contrary. The initial pat-down was also proper because it was dark, Smith had rested his pelvis against the car without prompting, and Officer Holden credibly testified that Smith appeared unusually nervous even though he was a passenger, not the driver.

Turning to the second and third pat-downs, the district court concluded that reasonable suspicion supported each pat-down. Smith's strange walk and repeated resting of his pelvis against the cars would have suggested to a reasonable

officer that Smith was armed and dangerous. The court also observed that "[a] one-frisk-only rule would create a privacy-adverse Fourth Amendment incentive" for officers to perform "the most intrusive frisk possible the first time around, knowing that no more would be allowed."

Smith moved for reconsideration, which the district court denied. He ultimately entered a conditional plea agreement, reserving his right to appeal the denial of his suppression motion. *See* Fed. R. Crim. P. 11(a)(2).

## II. Discussion

This court employs a dual standard of review for motions to suppress evidence: we review the district court's legal conclusions de novo and its factual findings for clear error. *United States v. Chang*, 999 F.3d 1059, 1065 (7th Cir. 2021). A district court's credibility determinations are entitled to substantial weight on appeal. *United States v. Richmond*, 924 F.3d 404, 410–11 (7th Cir. 2019).

### A. Legal Standards

Under *Terry v. Ohio*, 392 U.S. 1 (1968), law enforcement officers may conduct brief investigatory stops if they have reasonable suspicion that a person is engaged in criminal activity. *United States v. Jackson*, 962 F.3d 353, 357 (7th Cir. 2020) (citing *Navarette v. California*, 572 U.S. 393, 396 (2014)). "Reasonable suspicion must account for the totality of the circumstances and requires more than a hunch but less than probable cause and considerably less than preponderance of the evidence." *United States v. Reedy*, 989 F.3d 548, 552 (7th Cir. 2021) (internal quotation marks omitted). When officers reasonably believe they have witnessed a traffic violation, that provides reasonable suspicion justifying a traffic stop, even if the

violation is quite minor. *See Jackson*, 962 F.3d at 357 (hanging an air freshener from a rear-view mirror provided sufficient basis for a traffic stop).

The Fourth Amendment permits officers to order drivers and passengers out of a car during a traffic stop to ensure officer safety. *See Maryland v. Wilson*, 519 U.S. 408, 413–15 (1997). But "[t]he power to conduct a *Terry* stop does not automatically give police the power to frisk the subject for weapons." *United States v. Howard*, 729 F.3d 655, 662 (7th Cir. 2013) (citing *Terry*, 392 U.S. at 27). "To justify a patdown of the driver or a passenger during a traffic stop, … the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 327 (2009). On the other hand, an officer need not be certain that a person is hiding a weapon as opposed to drugs or other contraband before performing a pat-down. *See United States v. Ford*, 872 F.3d 412, 414–15 (7th Cir. 2017) ("Certainty about the presence of a weapon is unnecessary; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.") (internal quotation marks omitted).

## B. Reasonable Suspicion Supported Each Pat-Down

On appeal, Smith concedes that the traffic stop itself was lawful and that Officer Holden had reasonable suspicion to conduct the initial pat-down. By contrast, he contends that the second and third pat-downs lacked reasonable suspicion and were based on no more than a hunch that Smith was hiding something.

We have explained that "it is not necessarily unreasonable for police to frisk a person more than once," and "[t]here are

many cases where a first frisk misses a hidden weapon, sometimes with consequences that are serious or worse." *Howard*, 729 F.3d at 662. "The propriety of the second frisk turns on whether [the officer] had reasonable suspicion to believe that [a person], at the moment [the officer] frisked him, was a threat to officer safety." *Id*. In other words, what happened between each frisk is crucial to the analysis.

### 1. The Second Pat-Down

After the initial pat-down, Officer Holden asked Smith and Naylor to walk over to the police car so he could see them while running their names through a law-enforcement database. In the process, Officer Holden observed Smith's unusual side-to-side walk and saw Smith resting his pelvis on the front of the police car. When Officer Holden completed the database search, he asked Smith to walk with him back to Naylor's car. Smith continued to brush off Officer Holden's questions about what he was hiding. That's when Officer Holden performed the second pat-down.

On these facts, the second pat-down was reasonable. Officer Holden had seen Smith walk twice between the cars, repeatedly rest his pelvis against the cars as if to prop something up, and continue to appear unusually nervous. An officer in those circumstances could reasonably infer that Smith was hiding a weapon in his pants. *Cf. United States v. Weaver*, 9 F.4th 129, 147 (2d Cir. 2021) (en banc) (holding that reasonable suspicion supported frisk where defendant repeatedly made "suspicious movements concentrated around his waist and pelvis, where a firearm might easily be concealed," including pressing his pelvis against the vehicle). The second pat-down was also tailored to the situation and minimally invasive: Officer Holden's body-cam video shows that he

simply shook Smith's pant legs to see if something would fall out.

Smith protests that Officer Holden could not have actually believed he was hiding a weapon because, before the second pat-down, Officer Holden offered to uncuff one of Smith's hands so he could retrieve whatever was in his pants. In Smith's view, no reasonable officer would uncuff a person who the officer believed was armed and dangerous. Although this argument has some force, we reject it for two reasons. First, Officer Holden need not have been certain that Smith was hiding a weapon as opposed to drugs or other contraband before conducting the second pat-down. *See Ford*, 872 F.3d at 414–15; *United States v. Brown*, 188 F.3d 860, 866 (7th Cir. 1999). What matters is whether a reasonable officer would fear for his safety at that moment in time. Second, even if Officer Holden suspected that Smith was merely hiding drugs, an officer's subjective beliefs are irrelevant to the reasonable suspicion inquiry; courts ask whether, in light of the facts available to the officer at the time, a reasonable officer would have believed that the person was armed and dangerous. *See United States v. Patton*, 705 F.3d 734, 738 (7th Cir. 2013) (citing *Terry*, 392 U.S. at 27). As explained above, the answer to that question is yes.

### 2.  *The Third Pat-Down*

The final pat-down occurred after Officer Holden asked Smith to walk from Naylor's car to the police car yet again. This time, Officer Holden asked if Smith was injured because he had an exaggerated limp. Smith responded that he had been in a car accident. At that point, Officer Holden conducted a more thorough pat-down of Smith's groin area and

felt a hard metal object, which turned out to be a loaded handgun.

Smith argues that a reasonable officer should have accepted his story about injuring his leg in a car accident and left it at that. But we cannot say that the district court's credibility finding in favor of Officer Holden's testimony was clearly erroneous. *See Richmond*, 924 F.3d at 410–11. Based on the body-camera footage, it is difficult for this court to determine whether Smith's walk was indicative of an injury or something else. We defer to the district court's finding that Smith's behavior prior to the final pat-down elevated Officer Holden's suspicions.

In light of the totality of the circumstances—a nighttime traffic stop of an individual who appeared very nervous, walked strangely, and repeatedly rested his pelvis against cars as if to prop something up—we conclude that reasonable suspicion supported the final pat-down. As the district court observed, a contrary result would encourage more invasive initial pat-downs than the one that occurred here. Officer Holden's first pat-down focused on "hot spots" like Smith's waistband and pockets, the second pat-down consisted of shaking his pant legs, and only the third pat-down examined his groin area.

Nonetheless, we caution that our holding turns on the particular facts of this case. Multiple pat-downs during a traffic stop are not the norm, and reasonable suspicion must support each pat-down as the stop unfolds.

### III. Conclusion

For the foregoing reasons, the district court's denial of the motion to suppress is AFFIRMED.