In the

# United States Court of Appeals

## For the Seventh Circuit

No. 22-3231

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

REFUGIO AVILA,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:20-CR-00605(1) — **Steven C. Seeger**, *Judge.*

ARGUED SEPTEMBER 21, 2023 — DECIDED JULY 9, 2024

Before EASTERBROOK, ROVNER, and PRYOR, *Circuit Judges*.

PRYOR, *Circuit Judge*. Chicago police found a loaded handgun underneath Refugio Avila's shirt during a series of pat-downs at a traffic stop. After the district court denied both his motion to suppress and his motion to dismiss the indictment, Avila entered a conditional plea to a felony charge of being a felon in possession of a firearm. 18 U.S.C. § 922(g)(1). Avila reserved his right to challenge the district court's denial of his suppression motion as well as the motion to dismiss for

alleged violations of the Speedy Trial Act, 18 U.S.C. § 3161. For the reasons that follow, we affirm the court's ruling on the motion to suppress but find the court erred in denying Avila's motion to dismiss the indictment. Thus, we reverse and remand the case for further proceedings.

## I.    BACKGROUND

### A. Factual Background

Mid-afternoon on June 17, 2020, Refugio Avila, a known Satan's Disciple gang member, and his girlfriend, Fatima Hernandez, drove to a local restaurant. When they arrived, Hernandez parked her Dodge Journey minivan in front of the restaurant and went inside to retrieve a takeout order. Avila remained seated in the front passenger seat of the minivan. While sitting in the vehicle, Avila observed two Chicago Police Officers, Anthony Fosco and Robert Cabello, in an unmarked Ford Explorer, park across the street from the restaurant's parking lot.

At an evidentiary hearing on the motion to suppress, the officers testified that they were conducting "proactive policing"[1] on Chicago's west side and were in the area as part of a tactical team focused on preventing gang violence. That day,

---

[1] According to the testimony of Officer Cabello at the evidentiary hearing, the Chicago Police Department employs proactive policing, which is a law enforcement strategy aimed at preventing violent crime before it happens by creating a heavy police presence in a particular area. The officers assigned to these areas conduct traffic stops, engage in street stops, talk with the community, and gather intelligence with a focus toward reducing gun violence.

they were on the lookout for members of the Satan's Disciples and the Latin Kings, who were allegedly feuding.

Officer Fosco parked the unmarked police vehicle and Officer Cabello went inside the restaurant to get a beverage for Officer Fosco. According to Avila, who was still sitting in the front passenger seat of Hernandez's minivan, Officer Cabello stared Avila down while entering the restaurant and again when he left. After Officer Cabello returned to the police car with Officer Fosco, the officers repositioned their vehicle to be able to conduct surveillance.

Before long, Hernandez returned to her minivan with a bag of food and pulled out of the parking lot; the officers responded by cutting through the restaurant's parking lot and pulling behind the minivan.

Although the officers could not provide an explanation for why they chose to surveil Hernandez's vehicle or follow the minivan when it pulled out of the restaurant's parking lot, the district court specifically found that the officers watched and then "deliberately followed" Avila's car.

The officers soon observed three driving infractions. First, the officers observed Hernandez turn onto Rockwell Street but fail to activate her turn signal before coming to a stop. Second, the officers noticed Hernandez fail to activate her turn signal at least 100 feet before the intersection, in violation of Chicago Municipal Code 9-40-200(b). Lastly, the officers testified that neither Hernandez nor Avila were wearing their seatbelts prior to the stop. The officers activated their body cameras and initiated a traffic stop.

Both Officer Cabello and Officer Fosco were aware that Avila was a member of the Satan's Disciples gang, and that

this gang was known to carry firearms. Officer Fosco also observed Avila moving around in his seat prior to the minivan coming to a stop. Officer Fosco approached the driver's side, while Officer Cabello approached the passenger side where Avila was sitting. As Hernandez handed over her driver's license, Officer Fosco commented that he had seen Avila moving around inside the vehicle a lot and questioned whether Avila had a firearm. Avila responded, "hell no." Officer Fosco then asked Hernandez and Avila to step out of the vehicle, explaining that they had not pulled over immediately when the traffic stop was initiated. Both complied.

As Officer Fosco spoke with Hernandez and explained his reason for conducting the traffic stop, Officer Cabello dealt with Avila. Upon exiting the vehicle and without prompting, Avila raised his hands, spread his legs, and turned to face the minivan. Officer Cabello asked Avila whether he had a firearm. Avila again answered, "no." Officer Cabello then performed the first of three pat-downs. During this first pat-down, Officer Cabello discovered a large band around Avila's abdomen. Avila explained that he was wearing the medical device because of a hernia. In response, Officer Cabello discontinued searching around Avila's torso, and shifted to Avila's front pockets and waistline. Officer Cabello found nothing. This initial frisk lasted about thirty seconds. Officer Fosco then approached Avila and instructed him to walk to the rear passenger side of the vehicle. Avila complied.

Turning his attention to the minivan, Officer Cabello conducted a protective sweep of the vehicle—the search lasted about three minutes but also turned up nothing. While Officer Cabello searched the minivan, Avila remained near the back

right passenger side and continued to face the vehicle without turning around.

Officer Fosco observed Avila's positioning and went over to question him while Officer Cabello was searching the minivan. Officer Fosco again asked whether Avila had anything in the vehicle because he had been moving around a lot when the officers initiated the stop. Avila offered further explanation for the movement, stating that he was simply shifting the food that was in his lap.

Officer Fosco inquired about Avila's current affiliation with the Satan's Disciples. Avila responded, "18th Street." Officer Fosco, based on previous statements by other gang members, understood that this was a reference to Avila's membership in a faction of the Satan's Disciples. At this point, roughly a minute after the first pat-down, Officer Fosco conducted a second pat-down of Avila. He searched Avila's front pockets, legs, and groin area. Officer Fosco briefly lifted Avila's shirt and noticed the hernia strap around Avila's torso. This second search lasted about fifteen seconds and turned up nothing.

After Officer Cabello finished searching the minivan, he wrote down Avila's name and date of birth, retrieved Hernandez's driver's license from Officer Fosco, returned to the unmarked police car, and began running the information through a police database. Officer Fosco left Avila and approached Officer Cabello in the unmarked police car. While standing at the police car's open door, Officer Fosco told Officer Cabello that he thought Avila was standing in a weird position.

Officer Fosco then directed Avila to walk from the back of the minivan toward the police car. As Avila was walking

over, Officer Fosco noticed a bulge in Avila's torso and asked Avila if it was a gun. Officer Cabello turned away from his in-car computer, lifted Avila's shirt, and pulled a loaded handgun from Avila's hernia bandage.

### B. Procedural History

On September 8, 2020, the government charged Avila with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Avila made his initial appearance on September 16, 2020. Avila was arraigned and ordered detained on September 25, 2020.

The Speedy Trial Act applies to this prosecution. The Act's protections are triggered when an indictment is filed, or at the defendant's initial appearance, whichever occurs later. *United States v. Chanu*, 40 F.4th 528, 535 (7th Cir. 2022) (citing 18 U.S.C. § 3161(c)(1)). Because of the Speedy Trial Act challenge on appeal, we highlight several key dates of the district court's proceedings.

After Avila was charged with illegally possessing a weapon as a felon, he moved to suppress the firearm on October 23, 2020, and the government responded on November 20, 2020.[2] Avila filed his reply brief on December 18, 2020. Avila asserted two independent bases to suppress the handgun under the Fourth Amendment. First, he argued that the officers lacked reasonable suspicion to stop Hernandez and so the stop was not justified at the outset. Second, he argued that the officers unnecessarily prolonged the stop by

---

[2] On October 23, 2020, Avila filed his first motion to suppress. A few weeks later, however, on November 12, 2020, he requested to file a corrected brief. The district court granted the extension and ordered the government to respond.

removing him from the car, asking him questions unrelated to the traffic stop, and improperly searching him three times.

At a status hearing on January 14, 2021, the district court directed the parties to confer and propose dates for an evidentiary hearing. On March 5, 2021, the parties filed a joint status report requesting an evidentiary hearing. The parties also proposed the hearing occur during the week of May 3, 2021. In a ruling dated March 8, 2021, the district court granted the request setting the evidentiary hearing for May 6, 2021. The district court also ruled, with the parties' consent, that any Speedy Trial Act time would be excluded until Avila's motion to suppress was ruled on.

At the hearing in May 2021, Officer Fosco, Officer Cabello, and Avila each testified over the course of two days. The court also admitted multiple explanatory exhibits and the officers' body camera footage. About a month later, on June 9, 2021, the parties filed simultaneous post-hearing memorandums. On April 26, 2022—after almost ten months without a ruling on the motion to suppress—the parties filed a joint motion requesting a status hearing. The court set the status hearing for May 16, 2022. By the time of the status hearing, Avila's motion to suppress had been under advisement for nearly a year.

At the status hearing on May 16, 2022, the government pointed out a possible Speedy Trial Act problem. Though the court had excluded time pursuant to § 3161(h)(1)(D) of the Speedy Trial Act in the court's March 8, 2021, order, the government explained that this provision, along with § 3161(h)(1)(H) of the Speedy Trial Act, allowed only thirty days to be excluded after the suppression motion was taken under advisement—in other words, up to July 9, 2021, but no longer.

In response, the district judge explained that from his perspective he "operate[d] on geologic time, given the amount of things on the plate at any one time. My sense of time is a little different on this side of the veil…." The court then questioned Avila's counsel concerning the Speedy Trial Act problem. Counsel contended that the nearly yearlong delay in ruling on Avila's motion to suppress violated the Speedy Trial Act and the indictment should be dismissed. Because Avila's suppression motion was still pending and, if granted would dismiss the proceedings with prejudice, defense counsel also questioned whether the court intended to rule on the motion in the near term. Counsel explained that the timing of the court's suppression ruling would assist in determining when to file a motion to dismiss the indictment for the Speedy Trial Act violation. The court advised that if counsel believed a motion to dismiss the indictment was meritorious then he should file it.

Later that day, defense counsel filed a motion to dismiss the indictment, arguing that the Speedy Trial Act clock had expired in September 2021, and thus the indictment had to be dismissed. In a minute entry dated May 16, 2022, the court ordered the government to respond by June 13, 2022, and for Avila to file any reply by June 27, 2022. After briefing was completed on the motion to dismiss the indictment, the parties filed a joint motion for a status hearing. The court granted the motion and set the status hearing for July 20, 2022.

A day before the status hearing, on July 19, 2022, the court denied Avila's suppression motion. The court concluded that the traffic stop was proper because Hernandez had failed to properly use her turn signal when turning, and no evidence was presented to the contrary. The court also credited the

officers' testimony that neither Hernandez nor Avila were wearing their seatbelts when the stop was initiated. Having observed those two traffic violations, the district court found the officers had reasonable suspicion to stop the minivan.

Regarding the three pat-downs of Avila, the district court concluded that each frisk was reasonable. The initial pat-down by Officer Cabello and the second pat-down by Officer Fosco were appropriate for officer safety. The officers knew that Satan's Disciples carried firearms, that Avila was an active member of this violent street gang, the traffic stop occurred in an area with an active gang conflict between the Satan's Disciples and the Latin Kings, and Avila was making suspicious movements before the minivan came to a stop. With regards to the third frisk, the district court concluded that reasonable suspicion also supported this pat-down. Avila's strange positioning at the back of the minivan, the bulge in the abdomen area of his body, and his suspicious movement gave the officers reason to conduct the last pat-down.

The next day, July 20, 2022, the district court held a status hearing to discuss Avila's pending motion to dismiss the indictment based on the alleged the Speedy Trial Act violation. At the hearing, the court explained that when it excluded time on March 8, 2021, under the Speedy Trial Act pre-trial motions provision, § 3161(h)(1)(D), it had intended to exclude time under the ends-of-justice provision, § 3161(h)(7). The court took the motion under advisement, and on August 5, 2022, denied the motion after finding that the parties had agreed to exclude time under the Speedy Trial Act during the pendency of Avila's motion to suppress and the court's ruling on that motion. Though the parties had limited their

agreement to § 3161(h)(1)(D), the court explained that the con-tinuance was granted because the "ends of justice" supported it. In providing a retroactive explanation for the continuance, the court explained that the suppression motion was complex, the record was extensive, and one of the cases that Avila was relying on, *United States v. Cole*, 994 F.3d 844 (7th Cir. 2021), was reheard *en banc* while the suppression motion was pend-ing. The delay, the court explained, had nothing to do with its crowded calendar.

Not long after the court denied the motion to dismiss, Avila conditionally pled guilty to being a felon in possession of a firearm, reserving his right to challenge both the denial of his suppression motion and the motion to dismiss. The dis-trict court sentenced Avila to 32 months' imprisonment. He now appeals.

## II.    ANALYSIS

In this appeal, Avila challenges the district court's denial of both his suppression motion and his motion to dismiss for alleged violations of the Speedy Trial Act. We start with Avila's challenge to the suppression motion because a ruling in his favor could effectively preclude his reindictment whereas our resolution of his motion to dismiss the indict-ment would not. *See United States v. Janik*, 723 F.2d 537, 547 (7th Cir. 1983).

When reviewing the denial of a suppression motion, we assess conclusions of law de novo and findings of fact for clear error. *United States v. Muriel*, 418 F.3d 720, 723 (7th Cir. 2005). We give special deference to credibility determinations made by the district court. *United States v. Bailon*, 60 F.4th 1032, 1036 (7th Cir. 2023).

"Passengers in cars stopped by police are deemed 'seized' for Fourth Amendment purposes and are entitled to challenge the constitutionality of the detention." *United States v. Wilbourn*, 799 F.3d 900, 908 (7th Cir. 2015) (citing *Brendlin v. California*, 551 U.S. 249, 251 (2007)). Avila challenges the district court's conclusion that the traffic stop and subsequent frisks were supported by reasonable suspicion.

**A. The Suppression Motion**

    *1. Avila's Challenges to the Traffic Stop*

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. CONST. amend. IV. Because of this Constitutional protection, police officers ordinarily need probable cause to stop someone for the seizure to be reasonable. *United States v. Reedy*, 989 F.3d 548, 552 (7th Cir. 2021) (citing *Dunaway v. New York*, 442 U.S. 200, 213 (1979)). The Supreme Court, however, has carved out an exemption to this probable cause requirement for routine traffic stops.[3]

---

[3] Traffic stops are more analogous to *Terry* stops than formal arrests. *United States v. Jackson*, 962 F.3d 353, 357 (7th Cir. 2020) (citing *Rodriguez v. United States*, 575 U.S. 348, 354 (2015)); *Navarette v. California*, 572 U.S. 393, 396–97 (2014); s*ee also United States v. Rodriguez-Escalera*, 884 F.3d 661, 667–68 (7th Cir. 2018); *United States v. Lewis*, 920 F.3d 483, 489 n.6 (7th Cir. 2019). Under *Terry v. Ohio*, police officers are permitted to detain a person briefly to conduct an investigatory stop if the officers have reasonable suspicion that the person is engaged in criminal activity. *United States v. Smith*, 32 F.4th 638, 641 (7th Cir. 2022) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). "Reasonable suspicion must account for the totality of the circumstances and requires more than a hunch but less than probable cause and considerably less than preponderance of the evidence." *Reedy*, 989 F.3d at 552 (citations and quotation marks omitted).

An initial traffic stop passes constitutional muster if the officer reasonably believes he witnessed a traffic violation. *United States v. Cole*, 21 F.4th 421, 427 (7th Cir. 2021) (en banc) (noting that because traffic stops are typically brief detentions they require only reasonable suspicion of a traffic violation—not probable cause).

A traffic stop may, however, "become unlawful if it is prolonged beyond the time reasonably required to complete the mission of" the stop. *Rodriguez*, 575 U.S. at 354–55 (authority for the traffic stop ends when tasks tied to the traffic infraction are—or reasonably should have been—completed); *see also Cole*, 21 F.4th at 427 (citing *Hiibel v. Sixth Jud. Dist. Ct. of Nevada, Humboldt Cnty.*, 542 U.S. 177, 185 (2004)). "The mission of a traffic stop … is 'to address the traffic violation that warranted the stop and attend to related safety concerns.'" *Cole*, 21 F.4th at 428 (quoting *Rodriguez*, 575 U.S. at 354)). Thus, during a traffic stop, if there is reasonable suspicion that a person is armed and dangerous, officers may search for weapons. *See Michigan v. Long*, 463 U.S. 1032, 1049 (1983).

Avila argues that the district court erred in three primary ways when it denied his suppression motion. First, he maintains that the district court clearly erred by crediting the officers' testimony regarding the basis for the traffic stop. Second, he contends that the officers illegally prolonged the stop to investigate Avila for unrelated matters. Lastly, he contends the officers lacked reasonable suspicion to frisk him multiple times in hopes of finding evidence of criminal activity. Many of his arguments, however, are simply challenges to the court's credibility determination and factual findings, an approach that he recognizes is a longshot. *See United States v. Pedroza*, 269 F.3d 821, 826 (7th Cir. 2001) ("We give special

deference to [district court] credibility determinations, which can virtually never be clear error.").

Under the deferential standard of review for witness credibility determinations, we accept the district court's findings as true, unless the facts, as testified to by the police officers, are so unbelievable that no reasonable factfinder could credit them. *United States v. Contreras*, 820 F.3d 255, 263 (7th Cir. 2016) (citations omitted). Recall, at the suppression hearing, the officers were unable to explain why they began surveilling Avila or why they cut through the restaurant's parking lot to get behind the minivan and follow Hernandez and Avila. To Avila, these inconsistencies fit into a broader pattern of memory lapses and contradicted testimony, meaning the district court's decision to credit the officers' testimony that they saw any traffic violation was clearly erroneous.

Like the district court, we are skeptical about the officers' explanation that they came to follow Avila by accident. Officer Cabello had an opportunity to view Avila in the minivan, and after he returned to the police car, the officers repositioned the car into a surveillance position. The court determined this was done deliberately to surveil the minivan. Avila maintains that this finding somehow supports his argument that the officers fabricated the entire episode. We disagree.

We have never required an all-or-nothing approach to witness credibility. District courts are expected to be discerning and may choose to credit all or part of a witness's testimony depending on the totality of the evidence presented, "including the witness's statements and behavior, other witness statements, and corroborating or contrary evidence." *Contreras*, 820 F.3d at 263 (citation omitted); *see also Anderson v. City*

*of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."); *United States v. Vaccaro*, 915 F.3d 431, 435 (7th Cir. 2019) ("[T]he district court may credit all or part of a witness's testimony, especially when there is more than one permissible reading of the evidence."). A credibility determination will be overturned only if credited testimony is internally inconsistent, implausible, or contradicted by extrinsic evidence. *Contreras*, 820 F.3d at 263 (quoting *Blake v. United States*, 814 F.3d 851, 854–55 (7th Cir. 2016)).

The district court considered all of Avila's arguments about why the officers' testimony should not be trusted, and based on the evidence, adopted the view that, whatever their reasons for following Avila, the officers waited until they observed two traffic violations before stopping his car. We see no way to conclude that the officers' explanation of the facts leading to the stop was "so unbelievable" or so "contrary to the laws of nature" or "implausible" that no reasonable fact finder could credit them. *Contreras*, 820 F.3d at 263.

Avila also maintains that the district court clearly erred by crediting the officers' testimony regarding the seatbelt violation. While both Officers Cabello and Fosco testified that they could see that neither Hernandez nor Avila were wearing their seatbelts, Avila argues this testimony is unbelievable because the windows of Hernandez's minivan are darkly tinted, and the midday sun would have produced a significant glare obscuring the officers' view. According to Avila, the officers' body camera footage (and still images taken from that footage) support his argument that the minivan's dark windows were too dark for the officers to have seen a seatbelt violation.

In addition, Avila testified that he was actually sitting on top of his buckled seatbelt, and therefore it would have appeared to the officers who were traveling behind the minivan that Avila was buckled in his seatbelt.

We consider first the darkly tinted windows of the minivan. Officers Cabello and Fosco testified that they could see through the back windows that neither Avila nor Hernandez were wearing their seatbelts. Officer Fosco testified that he could see Hernandez's seatbelt "flapping to the left of her" and it was not across her body. In regard to the passenger's seatbelt, Officer Cabello testified that he noticed that Avila was not wearing his seatbelt properly because of the position of the belt. The court credited this testimony. We see nothing "contrary to the laws of nature" in the officers' testimony that they could see through the back windows. Even though the still images of the officers' body camera footage suggest that the windows were opaque, the court reviewed this evidence and permissibly concluded that the video footage did not show everything the human eye could see. We find no reason to overturn this finding.

Avila also contends the officers clearly fabricated their testimony regarding Hernandez's alleged turn signal violation. In response, the government maintains that the officers had reasonable suspicion to believe that Hernandez failed to signal 100 feet ahead of the intersection, in violation of Section 9-40-200(b) of the Chicago Municipal Code. At the suppression hearing, both officers testified that they observed Hernandez fail to timely engage her turn signal before turning right. Officer Cabello testified that he observed Hernandez stop, signal, then turn, while Officer Fosco testified that he saw Hernandez stop, turn, then signal. Avila argues that the only

explanation for the mismatch in their stories is fabrication. Hearing all of the testimony and viewing the evidence, however, the district court concluded that the officers' inconsistency was a product of waning memories, not a story made up from thin air. Regardless of when Hernandez engaged her turn signal, the officers consistently testified that it was less than 100 feet before Hernandez arrived at the intersection.

When the evidence is viewed in its entirety, the district court did not clearly err in finding that Officers Fosco and Cabello reasonably believed that they had witnessed two traffic violations prior to initiating the traffic stop. Because the officers' testimony established reasonable suspicion of a seatbelt violation and failure to signal properly, we find that the officers had a lawful basis to initiate the stop. *See Heien v. North Carolina*, 574 U.S. 54, 68 (2014) (one good reason to stop a vehicle is enough); *United States v. Yang*, 39 F.4th 893, 899–900 (7th Cir. 2022) (holding that reasonable suspicion supported a traffic stop based on officer's testimony that a vehicle rolled through a stop sign); *see also United States v. Van Dreel*, 155 F.3d 902, 905 (7th Cir. 1998) (noting that officers' subjective intentions play no role in Fourth Amendment analysis).

> 2. *Avila's challenges to the prolonged stop and multiple pat-downs*

Avila next advances two arguments. He argues that the scope of the traffic stop was not reasonably related to the stop's mission. He also asserts that the officers failed to provide a reason for each pat-down. Specifically, Avila contends that Officer Fosco had no "credible reason" to frisk him after Officer Cabello's pat-down and that the third frisk occurred after the traffic stop had been unlawfully prolonged.

A traffic stop is unlawfully prolonged when police detour from the mission of the stop. *Cole*, 21 F.4th at 428 (citing *Rodriguez*, 575 U.S. at 354). The stop's mission is essentially two-fold: ensuring officer safety and investigating the reason for the stop. *Id.* at 428–29. Officers need reasonable suspicion that a passenger is armed and dangerous before frisking that person. *United States v. Smith*, 32 F.4th 638, 642 (7th Cir. 2022). There is no one-and-done rule when it comes to roadside frisks; instead, what matters for each frisk is whether the officer has reasonable suspicion that the person frisked is armed and dangerous. *United States v. Howard*, 729 F.3d 655, 662 (7th Cir. 2013).

In regard to the traffic stop's scope, Avila's argument centers on the following exchanges at the evidentiary hearing:

| Defense Counsel: | You decided to extend the stop in order to keep looking for other misconduct that was not related to the traffic violation, fair? |
|---|---|
| Officer Fosco: | Correct. |
| … | |
| Defense Counsel: | And the reason that you didn't [let him go before the third pat-down] is because you were looking for evidence of other criminal behavior unrelated to the traffic stop, right? |
| Officer Fosco: | Yes. |

This exchange, in Avila's view, proves that the officers unlawfully extended the stop. He primarily argues that they did so by searching him three times—essentially that the searches were a delay tactic designed to let the officers root around for evidence of unrelated crimes.

But the Fourth Amendment inquiry is objective; whether a stop is reasonable does not depend on the officers'

subjective intent. *Whren v. United States*, 517 U.S. 806, 813 (1996). Instead, the question is whether the officers measurably extended the stop by pursuing unrelated investigations. *Arizona v. Johnson*, 555 U.S. 323, 333 (2009). In other words, a stop is not unreasonably prolonged until after the officers have, or reasonably should have, completed the tasks related to the traffic stop. *Rodriguez*, 575 U.S. at 354. Of course, if the officers develop reasonable suspicion of another crime, they don't have to turn a blind eye to that potential crime. *Cole*, 21 F.4th at 428.

Everything that happened during the six minutes between when the officers stopped Hernandez's minivan and recovered the gun from Avila's person was within the mission of the traffic stop. The officers permissibly ordered Hernandez and Avila out of the car. *See Maryland v. Wilson*, 519 U.S. 408, 413–15 (1997) (holding that officers may order passengers and drivers alike out of a vehicle during a traffic stop). The first frisk of Avila was permissible because Officer Cabello had reasonable suspicion to believe that Avila was armed and dangerous. *Johnson*, 555 U.S. at 327 ("To justify a patdown of … a passenger during a traffic stop, … the police must harbor reasonable suspicion that the person … is armed and dangerous."). Officer Cabello knew that Avila was a member of a violent gang that was engaged in an active conflict, and he saw Avila moving oddly in the minivan before it came to a stop. The short delay caused by ordering Hernandez and Avila out of the car and the first frisk (which lasted about thirty

seconds) was justified by officer-safety concerns and was clearly part of the stop's mission. *Cole*, 21 F.4th at 428.[4]

The second frisk (performed by Officer Fosco) was also justified by officer-safety concerns. While Officer Cabello was searching the minivan, Officer Fosco decided to frisk Avila again. A follow-up frisk is held to the same standard as an initial frisk, though we take account of "what happened between each frisk" when assessing reasonableness. *Smith*, 32 F.4th at 642. Officer Fosco knew that Officer Cabello had conducted a relatively cursory initial search. He also knew about Avila's affiliation with a violent street gang involved in an active conflict and odd movements before Hernandez pulled over. Moreover, Avila confirmed his gang affiliation to Officer Fosco and then stood awkwardly, essentially hugging the back of the vehicle. Based on these facts, Officer Fosco reasonably suspected that Avila could be armed and dangerous. Officer Fosco conducted a limited search of Avila's waistline which took about fifteen seconds to complete. All told, the second frisk was reasonable given the facts that Officer Fosco knew and the proportionately invasive search. *See id.*

After completing these two pat-downs, the officers turned their attention to completing the other aspects of the stop's mission: investigating the reason for the stop and running Hernandez's and Avila's information. Officer Cabello collected Avila's and Hernandez's information and began running it through a police database using his in-car

---

[4] Avila does not appear to argue that Officer Cabello's search of the minivan (which lasted about three minutes) violated his Fourth Amendment rights. He has therefore waived any such perfunctory argument. *E.g.*, *United States v. Butler*, 58 F.4th 364, 368 (7th Cir. 2023).

computer. As this was going on, Officer Fosco noticed Avila's odd posture—he was hunched over and still had not turned around to face the officers. So, Officer Fosco told Avila to walk toward Officer Cabello. As Avila was walking, Officer Fosco called out a conspicuous bulge on Avila's torso, a location the officers had not yet searched. Officer Cabello retrieved the gun from Avila's bandaged torso. With Avila approaching the officers with a visible bulge underneath his clothes, the officers had reasonable suspicion to frisk Avila for a third time. *See United States v. Adair*, 925 F.3d 931, 934 (7th Cir. 2019) (noting that a bulge in a suspect's clothing, among other things, provided reasonable suspicion for a frisk).

Each search was related to the stop's mission—ensuring officer safety—and did not unduly prolong the stop as a matter of law. *See Rodriguez*, 575 U.S. at 354 (holding that conducting tasks related to the mission of a traffic stop does not prolong the stop). Nor is there any basis on which to conclude that the "tasks tied to the traffic infraction [were]—or reasonably should have been—completed" before the officers discovered the gun. *Id*. To the contrary, the officers were actively investigating the stop when they recovered Avila's gun.

In sum, the officers had reasonable suspicion to stop the vehicle, to frisk Avila, and the stop was not unlawfully prolonged. Thus, there was no Fourth Amendment violation. The district court correctly concluded that the gun should not have been suppressed.

**B. The Speedy Trial Act Challenge**

The second issue on appeal is Avila's challenge to the district court's order denying his motion to dismiss the indictment based on an alleged violation of the Speedy Trial Act, 18

U.S.C. § 3161. We review the district court's interpretation of the Speedy Trial Act de novo but evaluate its decision to exclude time for an abuse of discretion. *United States v. Chanu*, 40 F.4th 528, 545 (7th Cir. 2022) (citation and alteration omitted).

### 1. *Understanding the Speedy Trial Act*

The Speedy Trial Act comprehensively governs the timely initiation of criminal trials and requires federal criminal trials to begin "within seventy days from the filing date … of the information or indictment, or from the date [of the defendant's initial appearance], whichever date last occurs." 18 U.S.C. § 3161(c)(1). In other words, the Act creates a seventy-day "speedy trial clock." *Zedner v. United States*, 547 U.S. 489, 507 (2006).[5]

This hard deadline is tempered by the district court's ability to exclude time in various circumstances provided in the Speedy Trial Act. *See* § 3161(h). In that way, the Act counterbalances its "procedural strictness" with meaningful flexibility. *Zedner*, 547 U.S. at 509.

Three exclusionary provisions are relevant to this appeal.[6] The first automatically excludes "[a]ny period of delay …

---

[5] If the clock expires, then the indictment "shall" be dismissed. § 3162(a)(2). Whether dismissal is with or without prejudice is left to the district court's discretion, guided by specific factors to consider. *Id*.

[6] In relevant part, § 3161(h) provides:

   **(h)** The following periods of delay shall be excluded in computing the time within which an information or indictment must be filed, or in computing the time within which the trial of any such offense must commence:

resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition" of the motion. § 3161(h)(1)(D). The second provision also applies automatically. It excuses up to thirty days of delay "during which any proceeding concerning the defendant is actually under advisement by the court." *Id.* § 3161(h)(1)(H). In practice, these two provisions automatically exclude from the speedy trial clock the time beginning with the filing of a pretrial motion until thirty days after the court receives the parties' post-motion-hearing briefs. *See*

---

**(1)** Any period of delay resulting from other proceedings concerning the defendant, including but not limited to--

…

**(D)** delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion;

…

**(H)** delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court.

…

**(7)(A)** Any period of delay resulting from a continuance granted by any judge on his own motion or at the request of the defendant or his counsel or at the request of the attorney for the Government, if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial. No such period of delay resulting from a continuance granted by the court in accordance with this paragraph shall be excludable under this subsection unless the court sets forth, in the record of the case, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial.

*Henderson v. United States*, 476 U.S. 321, 331 (1986); *Janik*, 723 F.2d at 543–44; *see also Bloate v. United States*, 559 U.S. 196, 206–07 (2010) (holding that § 3161(h)(1)(D) does not automatically exclude pretrial motion-related delays that precede filing the motion itself).

The third provision, which we will call the "ends-of-justice provision," is set out in § 3161(h)(7)(A) and provides "[m]uch of the Act's flexibility." *Zedner*, 547 U.S. at 498. Unlike the other two provisions, the ends-of-justice provision does not apply automatically. Instead, delay may be excluded under this provision if the court makes "on-the-record findings that the ends of justice served by [a] continuance outweigh the public's and defendant's interests in a speedy trial." *Chanu*, 40 F.4th at 546–47 (quoting *Zedner*, 547 U.S. at 498–99). But there are two important, timing-related caveats. First, those findings "must be made, if only in the judge's mind, *before granting the continuance*." *Zedner*, 547 U.S. at 506 (emphasis added). And, second, though the best course of action is to put those findings on the record contemporaneously with the exclusion, the district court's findings can be put on the record up to the point at which the court rules on the motion to dismiss. *Id.* at 507.

There is one more statutory feature of the Speedy Trial Act that bears mentioning. The Act expressly provides that "[n]o continuance under [the ends-of-justice provision] shall be granted because of general congestion of the court's calendar." § 3161(h)(7)(C). The heavy workload carried by district courts is "a factor wholly impermissible for consideration in support of an ends of justice continuance." *United States v. Ramirez*, 788 F.3d 732, 735 (7th Cir. 2015).

*2. Applying the Speedy Trial Act*

With this statutory backdrop, recall that, when the district court ruled on Avila's motion to dismiss the indictment on August 5, 2022, it had last excluded time on March 8, 2021—based on the Speedy Trial Act's automatic pretrial motion provision, § 3161(h)(1)(D). As the district court rightly recognized, however, this exclusion only tolled the speedy trial clock until June 9, 2021, which is when the parties filed their post-hearing briefs on the then-pending motion to suppress. The district court also properly recognized that the next thirty days, through July 9, 2021, were also automatically excluded under § 3161(h)(1)(H). Then, on May 16, 2022, the district court excluded time again, but this time under the ends-of-justice provision, § 3161(h)(7)(A). This exclusion is not contested on appeal. Therefore, to resolve Avila's challenge under the Speedy Trial Act, we must decide whether the 311 days between July 10, 2021, and May 16, 2022—far more than the seventy days permitted by the speedy trial clock—were properly excluded.[7]

At a status conference on July 20, 2022, to discuss Avila's motion to dismiss the indictment, the court explained that when it excluded time on March 8, 2021, under

---

[7] On appeal, Avila argues (and the government seems to concede) that the unexcluded period ran through July 19, 2022, which is when the district court finally ruled on Avila's suppression motion. This is incorrect. The speedy trial clock stopped on May 16, 2022, for two reasons. First, at a status hearing that day, the district court expressly excluded time in the interest of justice until the hearing on Avila's motion to dismiss the indictment. § 3161(h)(7)(A). Second, when Avila filed his motion to dismiss the indictment later that day, this automatically paused the clock until the hearing on the motion, § 3161(h)(1)(D), which occurred on July 20, 2022.

§ 3161(h)(1)(D), it had intended to exclude time under the ends-of-justice provision, § 3161(h)(7)(A). The court noted that it had erroneously relied on § 3161(h)(1)(D), but intended to rely on the ends-of-justice provision. At the conclusion of the hearing, the court directed the parties to file supplemental briefing and took the matter under advisement.

On August 5, 2022, prior to ruling on Avila's motion to dismiss, the district court entered retroactive ends-of-justice findings to support its decision to grant the parties' continuance on March 8, 2021. In doing so, the court relied on our decision in *United States v. Chanu*, 40 F.4th 528 (7th Cir. 2022).

In *Chanu*, the district court relied on the pretrial motion provision, § 3161(h)(1)(D), to exclude time until it ruled on the defendants' pretrial motion to dismiss the indictment for failure to state an offense. 40 F.4th at 535–36. About six months after briefing was complete, the court denied that motion. *Id.* at 535. The defendants then moved to dismiss the indictment under the Speedy Trial Act, arguing that more than seventy days of unexcluded delay had elapsed while the motion was pending. *Id.* at 537. The court denied the Speedy Trial Act motion and made on-the-record findings about why it would have excluded time under the ends-of-justice provision when it last excluded time. *Id.* at 537–38.

We concluded that a district court may retroactively enter findings to support an ends-of-justice exclusion, even if the court initially relied on the wrong "exclusionary hook." 40 F.4th at 548. That conclusion was based on *Zedner*'s instruction that "the findings must be made, if only in the judge's mind, before granting the continuance." *Id.* (quoting *Zedner*, 547 U.S. at 506).

Several factors convinced us that the lower court's retroactive findings were permissible and "in the judge's mind[] before granting the continuance." *Id.* First, we saw "no indication that the court" granted the continuance because of its crowded calendar. *Id.* at 548 (citing *Ramirez*, 788 F.3d at 735; 18 U.S.C. § 3161(h)(7)(C)). Second, the continuance itself was reasonable given that the litigants had asked the court to defer ruling on other motions until it dealt with the motion to dismiss for failure to state an offense. *Id.* What's more, the six-month delay was reasonable because the case was unusually complex—it involved a first-of-its-kind prosecution for spoofing trading orders under the wire fraud act, 18 U.S.C. § 1343. *Id.*

Relying on our holding in *Chanu* and recognizing that it had relied on the wrong exclusionary hook, the district court articulated several ends-of-justice findings to exclude the over 300-day delay between July 2021 and May 2022, including: (1) the suppression motion was complex, (2) the record was extensive, and (3) our rehearing en banc of *United States v. Cole*, 994 F.3d 844 (7th Cir. 2021), which Avila had relied on in his motion to suppress briefing.

There are several reasons this case requires a different outcome than *Chanu*. Most importantly, *Chanu* reaffirms our fidelity to the instructions in *Zedner* that the ends-of-justice findings must exist, if only in the judge's mind, at the time the continuance is granted. *See Chanu*, 40 F.4th at 547 (citing *Zedner*, 547 U.S. at 506). If a retroactive explanation for an ends-of-justice exclusion is based on findings that post-date the continuance, those findings (even if otherwise perfectly reasonable) could not have been "in the judge's mind" when the continuance was granted. *Zedner*, 547 U.S. at 506. The

Act's "procedural strictness," *id.* at 509, demands that district courts base any ends-of-justice continuance on "permissible factors," *Ramirez*, 788 F.3d at 736.

Here, the district court did not base its continuance on permissible factors because none of the ends-of-justice findings, save one, existed on March 8, 2021. Recall the district court cited the complexity of the case as evidenced by the extensive record—300 pages of transcripts, a score of exhibits, and extensive post-hearing filings—to support its ends-of-justice findings. But that record was not created until the evidentiary hearing and the parties' post-hearing briefing on the suppression motion in May and July 2021. Therefore, the notion that Avila's case was unusually complex could only have been marginally based on information that predated the March 8 continuance. As of March 8, 2021, the court had in hand only the parties' pre-hearing briefs on a routine suppression motion in a one-defendant felon-in-possession case. At that point, the factual complexity around the traffic stop was limited at best.

The court also heavily relied on a need to wait on our *en banc* decision in *United States v. Cole* because Avila cited extensively to the original panel's decision. This reason, however, also fails. The district court could not have known in March 2021 that we would decide in June 2021 to *sua sponte* rehear *Cole* en banc. *See United States v. Cole*, 849 F. App'x 598 (7th Cir. June 9, 2021) (ordering rehearing en banc). Post-continuance developments cannot provide after-the-fact justification for a continuance that predated those developments. *Zedner*, 547 U.S. at 506.

Lastly, we are troubled by the court's references to its crowded calendar when explaining the reason for the delay.

After the parties brought to the court's attention that the suppression motion had been pending for nearly a year, the court responded that it operates on "geologic time" and has "a thousand and one things" on its plate at any one time. True, the district court later recanted those comments, maintaining that they were taken out of context. But the comments are hard to reconcile with the Speedy Trial Act's determination that busyness is "a factor wholly impermissible for consideration in support of an ends of justice continuance." *Ramirez*, 788 F.3d at 735 (citing § 3161(h)(7)(C)).

In the end, we conclude that the court erred by articulating retroactive ends-of-justice findings that post-dated the court's March 8, 2021, continuance. *See Zedner*, 547 U.S. at 506. This is compounded by indications in the record that the district court based this continuance, at least partly, on its crowded calendar. Because the district court's ends-of-justice findings are unable to be reconciled with the requirements of the Speedy Trial Act, we conclude the district court erred in excluding time on this basis. Without permissible grounds for the continuance, we find the 300-plus-day delay from July 10, 2021, to May 16, 2021, cannot be excluded from the Speedy Trial Act's seventy-day clock and this delay violated the Act.

We reverse the district court's denial of Avila's motion to dismiss the indictment. The unexcused delay far exceeded Avila's speedy trial clock, therefore, the district court must vacate Avila's conviction and dismiss the indictment. We leave, however, the decision of whether to dismiss with prejudice in the court's sound discretion.

### III.   CONCLUSION

For these reasons, we AFFIRM in part, REVERSE in part, and REMAND for proceedings consistent with this opinion.